UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
HARTFORD DIVISION

| | | |
|---|---|---|
| In re | : | CASE NO. 17-21080 (JJT) |
| | : | |
| ANCHOR REEF CLUB AT | : | (Chapter 11) |
| BRANFORD, LLC, | : | |
| | : | (Re: Doc. I.D. No. 60) |
| Debtor(s). | : | |
| | : | |
| ANCHOR REEF CLUB AT | : | |
| BRANFORD, LLC, | : | |
| | : | |
| Movant. | : | |
| | : | |
| v. | : | |
| | : | |
| HRP ASSOCIATES, INC., | : | |
| | : | |
| Respondent. | : | FEBRUARY 20, 2018 |

## OBJECTION TO MOTION FOR TURNOVER

HRP Associates, Inc. ("HRP"), by and through its undersigned counsel, submits

this Objection to the Motion for Turnover of Documents and Records Under 11 U.S.C.

§ 542(e) (Doc. I.D. No. 60) (the "Turnover Motion") filed by the Debtor, Anchor Reef

Club at Branford, LLC (the "Debtor").

In support of this Objection, HRP respectfully represents as follows:

## BACKGROUND

1.     HRP has a long and complicated history as an environmental consultant

for the Debtor between 2002 and 2014 on approximately 17 different projects, several of

which were not completed because of Debtor's nonpayment. (See Affidavit of

Howard S. Hurd dated February 19, 2016 ("Hurd Aff.") attached as **Exhibit 1**, ¶¶ 6-8.)

2.      In contracts beginning at least in 2007, Debtor and HRP agreed that "All reports, boring logs, field notes, laboratory date, calculations, research and other documents and information prepared by HRP or its subcontractors are instruments of service and shall remain the sole property of HRP. Such documents and information [that] are delivered to the Client[ ] are for the Client's use only, and are not to be relied upon by any other party, unless agreed to by HRP in writing." (Hurd Aff., ¶¶ 9-10.)

3.      Debtor had an abysmal history of paying HRP for its services from the very beginning of HRP's work for the Debtor, which caused several projects to be halted mid-stream. Debtor also voluntarily abandoned other projects (or components of projects) from time to time for financial and development reasons. (Hurd Aff., ¶¶ 15-20, 57.)

4.      As is relevant to the closure report Debtor seeks now, Debtor never completed its site investigation and remediation work with HRP. (Hurd Aff., ¶ 57.)

5.      To the extent that any of HRP's projects for the Debtor had been paid in full and completed, HRP had already provided all deliverables to the Debtor (which totaled thousands of pages) and, in some instances, provided those deliverables several times as a professional courtesy. (Hurd Aff., ¶¶ 26-30.) HRP should not be required to provide previously-provided deliverables to the Debtor—at substantial cost to HRP—because of Debtor's failure to maintain its own records.

6.      But in addition to information concerning completed projects, Debtor now appears to seek information concerning projects that it never pursued to completion.

7.      Over the past five years, Debtor has several times asked HRP to recreate the deliverables it had already provided to the Debtor and/or provide information

concerning uncompleted projects, but has refused to compensate HRP for doing so. (Hurd Aff., ¶¶ 31-33.)

8.    In one instance in 2016, Debtor agreed to accept a lesser quantum of information from HRP, which HRP agreed to provide, believing that that would be the last time Debtor would try to seek its information without compensation. (Hurd Aff., ¶¶ 24, 33-43.)

9.    HRP does not wish to provide more information, particularly information pertaining to uncompleted projects, for several reasons:

    a.    the contractual agreement between HRP and the Debtor does not require HRP to provide this information;

    b.    the information sought spans over a decade of work and its sheer volume makes retrieval costly and prohibitive;

    c.    some data the Debtor seeks was never compiled into a final report, so the data is raw and is not quality assured;

    d.    the data is stale, some of it over a decade old, and would provide little benefit to the estate because intervening changes in the law concerning Remediation Standards Regulations ("RSRs") and Environmental Land Use Restrictions ("ELURs") have changed the standard of care underlying the collection of that data; and

    e.    it would be unduly burdensome to HRP to retrieve this information, costing HRP between $10,250 and $25,000 to compile. (Hurd Aff., ¶¶ 9-10, 48-73.)

## **ARGUMENT**

10.    HRP should not be required to turn over any documents to the Debtor for four principal reasons: (1) environmental consultants' records fall outside the scope of § 542(e); (2) the records would not benefit the estate; (3) the Debtor should be barred from pursuing this relief on the basis of unclean hands, waiver, and laches; and (4) retrieval of the records would pose an undue burden on HRP.

8981425v1

**Section 542(e) Was Not Intended to Apply to Environmental Consultants**

11.    Debtor agrees that HRP's data are not property of the Debtor's estate [Turnover Motion, ¶¶ 9-10], and thus this action falls only within the scope of § 542(e).

12.    Section 542(e) provides that "[s]ubject to any applicable privilege, after notice and hearing, a court may order an attorney, accountant, or other person that holds recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs, to turn over or disclose such recorded information to the trustee." 11 U.S.C. § 542(e).

13.    By its terms, Section 542(e) applies to professionals such as attorneys or accountants, which have state- or federal-law duties to provide client files to the client when requested. See, e.g., Marsh, Daly & Calhoun v. Solomon, 204 Conn. 639, 646-48 (1987) (describing lawyer's duty to return client's file in context with retaining lien); *The Rules on Providing Client Records*, Journal of Accountancy (August 1, 2013) https://www.journalofaccountancy.com/issues/2013/aug/20138044.html (detailing rules requiring CPA to return client file when requested).

14.    The legislative history also indicates that Section 542(e) was intended to apply to categories of professionals which have a duty to return a file but often assert charging liens in the face of such a duty. See Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 351 (1985) (§ 542(e) was intended to "'deprive[ ] accountants and attorneys of the leverage that they ha[d], . . . under State law lien provisions, to receive payment in full ahead of other creditors when the information they hold is necessary to the administration of the estate.'").

-4-

15.     Unlike lawyers and accountants, environmental consultants are not subject to any state- or federal- common law, statutory, or ethical duties to provide a client's file. At most, environmental consultants are subject to duties imposed by contract, but those contracts often provide that any reports, files, and data created or compiled by an environmental consultant remain the property of that consultant, and need not be provided to the client.

16.     Because environmental consultants like HRP do not have a common law, statutory, or ethical duties to provide a client its file, this Court should conclude that environmental consultants fall outside the scope of Section 542(e). This Court should also deny the Turnover Motion because the contract(s) in this case impose(s) no contractual duty for HRP to turn over the Debtor's file.

17.     The Debtor has not disclosed, and independent research has not revealed, any case in which Section 542(e) has been used to compel an environmental consultant to compile data or recreate a report for a Debtor wishing to sell or market its property. Cf. In re The Terraces Subdivision LLC, 2007 WL 4287742, at *2 (Bankr. D. Alaska 2007) (requiring land surveyor to turn over AutoCad files of the debtor's site plan, but imposing strict conditions on use of the file).

18.     The obvious reason why Section 542(e) has not been used to compel an environmental consultant to compile data or recreate a report for a Debtor wishing to sell or market its property is because, practically speaking, such a consultant would be hired by the estate to willingly provide these services or collect and compile that data. See, e.g., In re Kasden Fuel Co., 2011 WL 2036462 (Bankr. D. Conn. 2011) (employment of environmental consultant to determine what, if any, environmental

issues may exist on the property—by reviewing records, inspecting the property, and performing testing—was proper under § 1108).

19.    The fact is that the Debtor *has* retained an environmental consultant to assess the property, but appears unwilling to pay that environmental consultant to conduct the work that is necessary to market and sell the property.

20.    Debtor is therefore attempting to use Section 542(e) to conscript a past, and now-unwilling consultant into performing more work for the Debtor for free, in contravention to the express contractual relationship between the Debtor and HRP.

21.    Section 542(e) should not apply to an environmental consultant like HRP.

22.    If the Court nevertheless does conclude that Section 542(e) applies to environmental consultants, HRP should not be required to organize, interpret, or manipulate any of the information sought by the Debtor. See In re Vaughan Co., Realtors, 2015 WL 4498748, at *5 (Bankr. D.N.M. 2015) (denying turnover motion to the extent it sought an accounting because § 542(e) "applies only to existing information, not to information that has yet to be created"). See also Fed. R. Civ. P. 45(d)(3)(B) (unretained expert privilege).

23.    Moreover, and as discussed more fully below, HRP would also request narrowing of the scope of the information sought, reasonable compensation for retrieval of this information, and a waiver in connection with the information provided.

**The Records Sought Are Not Necessary to, and Will Not Benefit, the Estate**

24.    The legislative history of Section 542(e) suggests that Section 542(e) is limited to information that is "necessary" to administration of the estate. See Commodity

-6-

Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 351 (1985) (quoting legislative history); In re Matassini, 90 B.R. 508, 509 (Bankr. M.D. Fla. 1988).

25.     HRP's records are not necessary to administration of and would provide little benefit to the Debtor's estate.

26.     The data sought by the Debtor is stale, the standard of care for the work which resulted in creation of that data has changed in a way that directly impacts the relevance of the data, and the Debtor stopped work before HRP could prepare and complete a report, and so the data sought is raw and unverified. (Hurd Aff., ¶¶ 56-66.)

27.     At most, any current environmental consultant could potentially reference the data, but would need to supplement it with additional investigation that meets the current standard of care for a site investigation or remediation. (Hurd Aff., ¶ 62.)

28.     Unless Debtor could show that a closure report is likely to be issued by CT DEEP, which HRP—as the consultant that performed much environmental work on the Debtor's premises—contends may be inappropriate, the records sought from HRP are unlikely to benefit the estate. Instead, what would benefit the estate is the Debtor's dedication of the total amount of money needed to hire and retain environmental consultants to remediate the site in an uninterrupted fashion.

29.     This Court should sustain the objection and not require turnover.

30.     If the Court allows turnover, HRP requests that it place strict conditions on use of this information, either by limiting its use to historical background information that is not to be quoted by any other person (including the new environmental consultant) in a report to CT DEEP, or by requiring Debtor to release HRP from any claims relating to the environmental work done on the property. See In re The Terraces Subdivision LLC,

2007 WL 4287742, at *2 (Bankr. D. Alaska 2007) (imposing strict conditions on use of

land surveyor's file because of "legitimate concerns over the potential for unauthorized

use of these records").

### The Debtor Is Barred by the Doctrine of Unclean Hands, Waiver, and Laches

31.    The right to turnover under Section 542(e) is qualified by various equitable

doctrines such as laches, waiver, and unclean hands. In re Swift, 496 B.R. 89, 99

(Bankr. E.D.N.Y. 2013); In re Midway Airlines, Inc., 221 B.R. 411, 458-59 (Bankr. N.D.

Ill. 1998).

32.    "Laches bars the assertion of a claim based upon the plaintiff's

unreasonable delay which prejudices the other party. Waiver involves an intentional

relinquishment or abandonment of a known right." In re Swift, 496 B.R. 89, 99 (Bankr.

E.D.N.Y. 2013) (citations omitted). The doctrine of unclean hands "closes the doors of a

court of equity to one tainted with inequitableness or bad faith relative to the matter in

which he seeks relief . . . ." Id. at 100 (citations omitted).

33.    As set forth more fully in the Hurd Affidavit, Debtor has been attempting to

receive free services from HRP for almost 15 years, and has been attempting to require

HRP to turn over its data for 5 years. (Hurd Aff., ¶¶ 6-8, 31-33.)

34.    In the beginning, HRP had been willing to assist the Debtor with extra-

contractual tasks as a professional courtesy. But as time went on, and Debtor took more

and more advantage of HRP, HRP made clear that it was insisting on its contractual

right not to provide this information for free.

35.    Confronted with HRP's unrelenting resistance to providing this information

for free, in 2016, Debtor appeared to cease its efforts to retrieve HRP's file in

connection with settlement of an underlying superior court action for nonpayment.
Debtor sought, and HRP provided, a list or inventory of the files HRP had, so that the
Debtor could determine what files it was missing and ostensibly hire a consultant to
perform work relevant to information it knew to be incomplete. After HRP provided this
information, it believed it was finished with the Debtor's requests. (Hurd Aff., ¶¶ 24, 33-
43.) But only a year later, the Debtor now seeks even more information for free.

36.     Debtor's Turnover Motion of HRP's file comes after substantial delays that
are prejudicial to HRP because, as time goes by, it becomes more difficult and cost-
prohibitive to retrieve information, and the information itself becomes stale.

37.     Debtor's requests for a broad array of HRP's information also flies in the
face of a 2016 arrangement for Debtor to receive much less information with the tacit
understanding that that would be the Debtor's last request.

38.     This Court should deny Debtor's Turnover Motion because Debtor has
waited too long, has relinquished any arguable right it had to request this information,
and has come to the Court with unclean hands.

**Retrieval of the Records Would Place an Undue Burden on HRP**

39.     This Court should deny the Turnover Motion because it would pose an
undue burden on HRP to provide this information.

40.     HRP has made a particularized showing that it would suffer an undue
burden if required to turn over the Debtor's data, including costs of up to $25,000. (Hurd
Aff., ¶¶ 48-54.) See In re Willingham, 493 B.R. 628, 634 (Bankr. M.D. Fla. 2013).

41.     It is also unclear what scope of information Debtor seeks. In its proposed
order, Debtor seeks "all files" relating to HRP's work performed pre-petition. But in its

-9-

motion, Debtor seemingly limits its request to a certain subset of that information. HRP
seeks clarification of the scope of information sought, which drastically impacts the
amount it would cost HRP to retrieve the information.

42.    If the Court is nevertheless inclined to grant the motion, HRP requests
reasonable compensation for its efforts, which is estimated to range between $10,250
and $25,000, as set forth more fully in the attached affidavit.

WHEREFORE, for all the reasons set forth above, HRP respectfully requests that
the Court deny the Turnover Motion or, in the alternative, restrict the scope of
information, require Debtor to compensate HRP for retrieval of the information; impose
conditions on use of the information; and require Debtor to release HRP from liability on
account of that information.

RESPONDENT - HRP ASSOCIATES, INC.


By    /s/ Robert E. Kaelin
     Robert E. Kaelin – ct11631
     rkaelin@murthalaw.com
     Sarah Gruber – ct29918
     sgruber@murthalaw.com

Murtha Cullina LLP
185 Asylum Street
Hartford, Connecticut 06103
Telephone:  860.240.6000
Facsimile:   860.240.6150
Its Attorney

8981425v1

# EXHIBIT 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
HARTFORD DIVISION

|  |  |  |
|---|---|---|
| In re | : | CASE NO. 17-21080 (JJT) |
|  | : |  |
| ANCHOR REEF CLUB AT | : | (Chapter 11) |
| BRANFORD, LLC, | : |  |
|  | : | (Re: Doc. I.D. No. 60) |
| Debtor. | : |  |
|  | : |  |
|  | : |  |
| ANCHOR REEF CLUB AT | : |  |
| BRANFORD, LLC., | : |  |
|  | : |  |
| Movant. | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
|  | : |  |
| HRP ASSOCIATES, INC. | : |  |
|  | : |  |
| Respondent. | : |  |

## AFFIDAVIT OF HOWARD S. HURD

Howard S. Hurd, being first duly sworn, deposes and says:

1.      I am the Chief Operating Officer of HRP Associates, Inc. ("HRP"), and

have personal knowledge of the business and operations of HRP, as well as personal

knowledge of HRP's dealings with Anchor Reef Club at Branford, LLC ("Debtor") for

over a decade. I submit this Affidavit in connection with HRP's Objection to Debtor's

Motion for HRP to turn over documents and records [Doc. I.D. No. 60].

## Background

2.      I have a Bachelors of Science in Geology from the University of Rhode

Island, and a Masters of Science in Environmental Management from Rensselaer

Polytechnic Institute.

3.    I have worked at HRP for almost 31 years. In my role as Chief Operating

Officer at HRP, I supervise and execute large scale environmental site assessments,

hydrogeological investigations, remedial investigation/feasibility studies, and remedial

actions.

4.    I have over 33 years of experience in conducting environmental

investigations and remediation at brownfield sites; superfund sites; military installations;

industrial/manufacturing operations; and commercial, agricultural and residential properties.

5.    I am a Licensed Environmental Professional within the meaning of Conn.

Gen. Stat. § 22a-133v, and I am also a Certified Professional Geologist.

6.    On or about October 16, 2002, the Debtor engaged HRP to perform

environmental services, including but not limited to site assessment, investigation,

remediation, project management, hazmat evaluation and management, site

development engineering and permitting in connection with real property owned by the

Debtor at Indian Neck Avenue and 60 Maple Street, Branford, CT (the "Premises").

7.    HRP's work for the Debtor would eventually span the years 2002 through

2014, pursuant to at least 17 separate projects. Those projects, in order of occurrence,

included:

    (1)    Phase 1 ESA, ECAF, site assessment work; Phase 2 subsurface
             investigation; and remediation;

    (2)    Phase 2 subsurface investigation, Phase 3 degree and extent
             subsurface investigation, and remediation;

    (3)    Phase 2 subsurface investigation;

    (4)    Phase 2 subsurface investigation;

    (5)    Water management, NPDES, storm water, waste water, permitting,
             design;

-2-

(6)     Site plans;

(7)     Remediation;

(8)     Site plans;

(9)     Site plans;

(10)    Water management, NPDES, storm water, waste water, permitting, design;

(11)    Phase 2 subsurface investigation;

(12)    Phase 1 ESA, ECAF, site assessment work;

(13)    Phase 1 ESA, ECAF, site assessment work;

(14)    Phase 1 ESA, ECAF, site assessment work;

(15)    Building Assessment, building component investigations (hazmat, asbestos, PCB, heavy metals, etc.);

(16)    Remediation; and

(17)    Civil engineering, site design, permitting, plans & specs.

8.    The services provided by HRP were provided in accordance with numerous contracts signed by Debtor and HRP.

9.    In contracts beginning at least in 2007, HRP and the Debtor agreed in writing that "All reports, boring logs, field notes, laboratory data, calculations, research and other documents and information prepared by HRP or its subcontractors are instruments of service and shall remain the sole property of HRP. Such documents and information [that] are delivered to the Client[ ] are for the Client's use only, and are not to be relied upon by any other party, unless agreed to by HRP in writing." See 2007 Contract, attached hereto as **Exhibit A**, at p. 2.[1]

---

[1]    In contracts dating back to 2003 and 2005, the Debtor agreed that any work product by HRP could be sold in the event that Debtor was in default of its payment obligations.

-3-

8981576v1

10.     In addition to the 2007 Contract, the Debtor and HRP entered into several subsequent contracts containing the same language which made clear that HRP's reports and data were not the property of the Debtor. See 2010 Contract, attached hereto as **Exhibit B**, at p. 2; 2012 Contract, attached hereto as **Exhibit C**, at p. 2.

11.     Each of these contracts also contains arbitration provisions.

12.     HRP insists on this contractual provision's being a part of its contracts because it wants to ensure that HRP's services are not cited by clients, or subsequent companies, in a way that would result in a misrepresentation of the site conditions, or that would reflect poorly on HRP and its environmental consulting services in any way.

13.     The contractual provision HRP puts in its contract does not preclude HRP from giving its data to third parties. Indeed, it is common for HRP to be engaged to provide remediation reports to the Connecticut Department of Energy and Environmental Protection (CT DEEP). In that event, HRP's records and data are agreed-to in writing to be provided to that third party, and in fact are given to that third party as part of a completed deliverable on that project.

14.     Upon information and belief, these sorts of contractual provisions are standard in the environmental remediation industry.

### History of Debtor's Projects with HRP and
### Abandonment of Efforts to Receive HRP's Data

15.     In 2002, almost immediately after engaging HRP to perform environmental services, the Debtor stopped paying HRP for its work.

16.     In fact, the almost 15-year contractual relationship between HRP and Debtor was constantly marred by Debtor's non-payment.

17.     On or about November 20, 2006, for example, HRP required the Debtor to

-4-

enter into a promissory note in the amount of $41,595.38 plus interest for services the

Debtor had already received from HRP, and for which the Debtor had failed to

compensate HRP.

18.     Almost 10 years later, Debtor had still not paid on that very promissory

note, despite its constant solicitation of HRP to continue its environmental services (and

to enter into additional contracts), and Debtor's promises that it would become current

on its outstanding balances.

19.     Eventually, after a decade of non-payment and constant broken promises

that it would become current on its outstanding balances, HRP had had enough.

20.     The last work performed by HRP on behalf of the Debtor was on or about

March of 2014. There was correspondence post-dating March of 2014, but it mostly

consisted of attempts by HRP to be paid for its services.

21.     Subsequently, on June 16, 2016, HRP commenced a legal action against

the Debtor in the Superior Court, entitled <u>HRP Associates, Inc. v. Anchor Reef Club at</u>

<u>Branford, LLC</u>, No. HHB-16CV-6033820-S ("Superior Court Action"), attached hereto as

**Exhibit D**. In the Superior Court Action, HRP sought monetary damages in the amount

of $108,396.68, $75,270.53 of which included principal and interest on the Promissory

Note, and the remainder constituting attorneys fees and costs of collection.

22.     In its Answer, Debtor admitted that it owed money to HRP and that, in

over a decade, it had paid only $10,000, which was less than a quarter of the principal

amount owed on the promissory note. <u>See</u> Answer, attached hereto as **Exhibit E**.

23.     After HRP moved for Summary Judgment on September 9, 2016 (<u>see</u>

Motion for Summary Judgment, attached hereto as **Exhibit F**), Debtor offered to settle

-5-

the case. On September 29, 2016, Debtor offered to pay the entire balance of the promissory note, $75,270.53, except that it would not pay for attorneys fees and costs of collection.

24.     In exchange for paying the full amount of its liability, Debtor requested that HRP dismiss the action and provide it with a release, as well as provide it with HRP's "entire file" relating to the Debtor.

25.     The "entire file" of Debtor consisted of records spanning the years 2002 to 2014 (and beyond), including some projects that had been completed, and some that had not been completed due to Debtor's non-payment. Several of the projects included multiple deliverables by HRP, many of which had been halted mid-stream given Debtor's non-payment.

26.     To the extent that any of HRP's projects for the Debtor had been paid in full, HRP had already provided all deliverables to the Debtor.

27.     HRP has never withheld any completed information or reports from the Debtor.

28.     Upon information and belief, Debtor's poor management of its affairs has caused it to misplace or lose HRP's relevant deliverables for projects that had not been abandoned because of Debtor's non-payment.

29.     Upon information and belief, HRP has provided thousands of pages of reports and documents to the Debtor over the years, which the Debtor has misplaced.

30.     Debtor has, in the past, requested numerous copies of HRP's deliverables.

31.     For example, in 2013, the Debtor was in talks to sell a portion of the

-6-

Premises, and the environmental consultant for the prospective buyer contacted HRP to request certain reports that had already been provided to the Debtor.

32.    HRP did not provide this information on three bases: (1) the contract did not require it to do so and, in fact, explicitly provided that its reports were HRP's property; (2) HRP had, in the past, provided the original *and copies of this* information to the Debtor but had not been paid for its efforts in doing so; and (3) the Debtor still owed HRP money at the time.

33.    Because of this long history, HRP refused to provide the Debtor with its "entire file" because it would have cost HRP thousands of dollars to identify, inventory, assemble, and prepare all the final reports that HRP had already prepared over the prior decade of work, and determine exactly which projects had been faithfully completed despite Debtor's failure to pay. Accordingly, and in response to the Debtor's request, HRP counteroffered to provide Debtor the information it requested only if Debtor paid a $10,000 retainer for HRP to assemble this information, and that retainer was as little as $10,000 only because such information could be issued electronically.

34.    It would have been unduly burdensome and constitute an extreme hardship for HRP to assemble this information. Some of the documents requested might have no longer existed, given the passage of time. Moreover, the scope of documents sought was extensive and would require hours upon hours of efforts by HRP.

35.    It is HRP's practice to charge customers if it requests information such as that sought by the Debtor in this case.

36.    It is industry practice to charge customers if they request information such as that sought by the Debtor in this case.

-7-

37.    In 2016, the Debtor did not agree to HRP's offer to provide the file for a minimum retainer of $10,000.

38.    Instead of paying for HRP's efforts to assemble the file, the Debtor requested the cheaper option: a list or inventory of the files HRP had, so that the Debtor could determine what files it was missing and ostensibly hire a consultant to perform the information it knew to be incomplete (due to its own prior nonpayment). The Debtor therefore requested from HRP a non-specific list of "categories" of projects HRP had performed for the Debtor.

39.    HRP agreed to provide a non-specific list of "categories" of projects HRP had performed for the Debtor. On or about October 27, 2016, HRP provided this list to its attorney in the Superior Court Action, who then provided it to the Debtor.

40.    This proffered list from HRP satisfied the Debtor's prior counsel (now a creditor in the Debtor's bankruptcy case), who then effectuated the settlement by causing the Debtor to pay HRP's counsel the $75,270.53 settlement amount. Because of HRP's attorneys fees, the HRP netted only $50,862.72. See Payment, attached hereto as **Exhibit G**.

41.    On October 31, 2016, HRP signed a release for the Superior Court Action, which released the Debtor solely from "the specific claims made" in the Superior Court Action. See Release, attached hereto as **Exhibit H**.

42.    After HRP provided the list to Debtor, signed the release, and received partial payment on its outstanding balance from Debtor, HRP believed it was finally finished with the Debtor.

43.    Almost a year went by without any contact from the Debtor.

-8-

44.    On July 19, 2017, the Debtor filed a Chapter 11 petition [Doc. I.D. No. 1].

45.    It now appears that Debtor either seeks to market the Premises or has already found a prospective buyer of its Premises who, like the previous prospective buyer, now realizes that Debtor has failed to maintain its records concerning the environmental work done on the Premises.

46.    Just as it did several years ago, Debtor now seeks files related to inspections and remediation at the Premises, tables of soil qualities transported and disposed from remediation areas, maps and tables from all remedial excavation sidewall and base sampling results, and lab results [Doc. I.D. No. 60, at p. 2 (defining "Documents")]. Debtor also appears to seek a broader category of items in its proposed order, which include "all documents in [HRP's] possession related to the work [HRP] performed for the debtor prior to the filing of the debtor's bankruptcy petition . . . ." [Id., at p. 4].

47.    Just as it refused several years ago, Debtor again refuses to pay HRP for what it would cost to assemble this information.

## Production of Records Would Be Unduly Costly and Provide Little Value to the Debtor's Estate

48.    It would be unduly burdensome and constitute an extreme hardship for HRP to assemble this information.

49.    The records at issue span almost 15 years of work. The sheer volume and scope of the work performed by HRP for the Debtor is extensive and would require hours upon hours of efforts by HRP to locate and assemble, as well as to cull out extraneous and non-responsive documents such as field notes, and then determine which of the data pertains to projects that were actually completed.

8981576v1

50.    The passage of time—both from the inception of the work and from the

time Debtor requested this information in connection with the 2016 settlement—also

hinders and makes more difficult assembly of this information, for many reasons,

including that:

(1)    Some of the documents requested might no longer exist, given the passage of time.

(2)    Some of the files are in cold storage and are on paper only, which requires manual retrieval and analysis for relevance; and

(3)    Several employees that worked on the Debtor's projects have since left HRP, which means that someone else would need to search through physical and electronic records of an absent custodian.

51.    I estimate that it would take me at least 50 hours to assemble this data if

Debtor seeks "all files" relating to HRP's work, and even more time than that if Debtor

seeks a subset of the information specific to whatever his new environmental consultant

has requested. At my hourly rate of $205/hr., this would cost, at a minimum,

$10,250.00.

52.    I also anticipate that I would need the assistance of other employees in

assembling this data, at variable hourly rates that would increase this estimated cost.

53.    Finally, if Debtor seeks e-mails and other electronic records from over a

decade ago, I would have to consider hiring an electronic document retrieval company,

which could cost upwards of an additional $15,000.

54.    I therefore estimate that retrieval of this information could cost upwards of

$25,000.

55.    Apart from being unduly burdensome and extremely costly to produce

these records, HRP does not wish for this data to be used in any subsequent marketing

-10-

of the Premises.

56.    The data sought from HRP is extraordinarily stale data—over a decade

old—that may not even be helpful for a closure report, not to mention that it is

incomplete and not suitable for use in any subsequent report because of Debtor's

actions during the entire life of HRP's work for Debtor.

57.    Of the many projects HRP had been contracted to do, the major projects

that might relate to a CT DEEP closure report are site investigation and remediation.

Both projects, which began years ago, were never completed because of Debtor's

nonpayment.

58.    As for the site investigation, if Debtor had followed through with the project

to its completion, the project would have resulted in a final report in which HRP would

have detailed the tests performed on the Premises by its employees and agents. To do

so, HRP would have performed quality assurance and quality control over any samples

taken and tests done.

59.    After HRP began its work and employees took samples on the Premises,

the Debtor caused the project to cease mid-stream, and in fact elected to hold off on

certain investigations for financial and development reasons. As a result, I was unable

to and did not perform quality assurance and quality control over the samples taken.

Because I did not perform quality assurance and quality control over those tests, I do

not wish for any of the data underlying those tests to be used by any third party.

60.    Moreover, since those samples were taken—some of which are over a

decade old—the work concerning the site investigation no longer meets the standard of

care for such an investigation. Indeed, the Remediation Standards Regulations

8981576v1

("RSRs") and Environmental Land Use Restrictions ("ELURs") have undergone

significant changes in Connecticut such that the investigation work performed by HRP

back then does not meet the standard of care for today.

61.    In my opinion and in my experience as an environmental consultant, this

sort of data would provide little value to the Debtor's estate because it is stale, because

the RSRs and ELURs have changed in a way that directly impacts the relevance of the

data, and because the Debtor stopped work before HRP could prepare and complete a

report, and so the data is raw and unverified.

62.    At most, any current environmental consultant could potentially reference

the data, but would need to supplement it with additional investigation that meets the

current standard of care for a site investigation.

63.    As another example, HRP was engaged to perform remediation for the

Debtor. The scope of the remediation work was to include sitewide removal of

contamination, and then removal of polychlorinated biphenyl (PCB) hot spots

throughout the site. Neither of these two main objectives of the remediation work was

ever completed on this site due to various factors, including the Debtor's nonpayment.

64.    In connection with HRP's remediation work, HRP required a survey of the

Premises to determine the exact clean fill thicknesses needed on various portions of the

Premises. The Debtor hired its own surveyor to perform the survey, but HRP was never

given any survey, nor does HRP know whether the survey was ever completed. As a

result, HRP's remediation work could not proceed.

65.    Moreover, much of the actual remediation (*i.e.*, removing contaminated

soil from the Premises) was performed by the Debtor, the Debtor's principal and

-12-

associates, and/or others affiliated with the Debtor and its principal. As a result, much of the documentation needed to determine the Debtor's actual remediation actions on the Premises are within Debtor's knowledge and control.

66.    In my opinion and in my experience as an environmental consultant, the information HRP has in its possession concerning Debtor's actions to remediate the site are incomplete and would provide little value to the Debtor's estate because it is stale, because the RSRs and ELURs have changed in a way that directly impacts the scope of work that would need to be completed, and because the Debtor stopped work before HRP could prepare and complete a report.

67.    Upon information and belief, Debtor is attempting to use data it might obtain from HRP to show that it completed remediation of the Premises when in fact HRP did not complete remediation for the Debtor.

68.    Upon information and belief, Debtor did not engage any other environmental company to complete remediation.

69.    If Debtor is permitted to use HRP's data to assert that it has completed remediation, HRP's reputation will be at risk.

70.    In sum, HRP does not wish to provide this information and is rightfully relying on its contract in order to protect itself and any future purchasers of the Debtor's Premises.

71.    HRP therefore respectfully requests that the Court deny the Debtor's motion for turnover.

72.    In the event the Court would require HRP to assemble this data, HRP respectfully requests that the Court clarify and narrow the scope of information HRP

-13-

must provide.

73.    In the event the Court would require HRP to assemble this data, HRP also respectfully requests that the Court require the Debtor to pay for the reasonable costs of doing so, which I estimate could cost upwards of $25,000.

Dated at _Farmington_, Connecticut, this _20_th day of February, 2018.

_____
Howard S. Hurd, CPG, LEP

Subscribed and sworn to before me this __th day of February, 2018.

_____
Notary Public
My Commission Expires

DEBORAH J. BERARDI
Notary Public-Connecticut
My Commission Expires
May 31. 2021

8981576v1

# EXHIBIT A

# TERMS AND CONDITIONS

# HRP Associates, Inc.

**CLIENT:** Anchor Reef Club at Branford, LLC

**DOLLAR VALUE OF PROPOSAL: $13,300.00 (No Retainer)**

**PROPOSAL DATE:** January 15, 2007

**SITE LOCATION:** 60 Maple Street, Branford, CT

1. **AGREEMENT AND PARTIES:** HRP Associates, Inc. is referred to herein as HRP. The individual or group to which our Proposal is addressed is hereby referred to as the Client. The Agreement by and between HRP and the Client consists of the scope of services specifically defined in the attached Proposal, any documents that are attached to the Proposal and these Terms and Conditions.

2. **COMPENSATION:** The costs of basic services to be provided by HRP are specified in the Proposal. HRP will submit invoices to the Client on a monthly basis documenting costs incurred in the previous calendar month including labor charges, laboratory analysis charges, and expenses, as applicable, unless a different billing method is specified in the Proposal. Invoices are due and payable upon receipt by the Client. Interest in the amount of 1½% per month or, if lower, the maximum lawful rate, will be charged on any amounts that are unpaid at the end of thirty (30) calendar days of the invoice date. Invoices not paid within sixty (60) calendar days of the invoice date will result in cessation of work until such invoices rendered are paid in full. In the event payment in full is not received within ninety (90) calendar days of the invoice date, the account shall also be subject to collection by our attorney, and any and all reasonable costs of collection, including reasonable attorney's fees, shall be paid by the Client. Further, HRP reserves the right to sell the work product to any interested party in the event the Client is in default of its payment obligations for a period of greater than ninety (90) days. Payment can be made by check to: HRP Associates, Inc., 197 Scott Swamp Road, Farmington, Connecticut 06032, Attention: Accounts Receivable. To arrange payment by credit card (MasterCard or Visa), contact HRP's Accounts Receivable Department at 860-674-9570. Reference to HRP's invoice number should be included with the payment.

3. **ADDITIONAL CHARGES:** Costs quoted do not include State or local taxes, which will be added to invoices where applicable. The cost for project-related information technology communications, including but not limited to cellular phones, facsimile, and project information technology systems management software and hardware, will be charged at two percent (2%) of the total labor charges for projects billed on a time and materials basis, and is in addition to the specified not-to-exceed cost. The foregoing sentence is not applicable to projects billed on a lump-sum basis. A twenty-five percent (25%) surcharge applies to labor in connection with expert testimony, and such labor will be billed in ½ day increments.

4. **ADDITIONAL SERVICES:** HRP will not exceed the cost for basic services outlined in the Proposal without the Client's written consent. If authorized by the Client, services provided beyond the basic Scope of Services will be billed on the following basis:

(a) **Direct Labor Costs** – A specified rate for each category of HRP's personnel, for the time that they actually spent working on the Client's project and for required travel (portal to portal), as documented and certified by HRP. HRP may revise rates from time to time to account for salary adjustments and increased costs. Required and/or client requested overtime is billed at a factor of 1.5 times the hourly rates charged. Overtime is defined as any hours worked beyond eight (8) hours in one day or forty (40) hours in one work week, or on Saturday, Sunday, or an HRP holiday.

(b) **Laboratory Analysis Charges** – A specified rate for each laboratory analysis parameter beyond those included in the Proposal (where applicable).

(c) **Expenses** – Where applicable, project-related expenses for travel, meals, overnight delivery, priority mail, outside reproduction, courier services, subcontracting (other than laboratory analysis), material and equipment purchases, and miscellaneous other direct charges are billed at cost plus twenty percent (20%) for handling and administration.

5. **HRP'S RESPONSIBILITIES:** HRP shall comply with all Federal, State and local laws, ordinances, rules and regulations, permits, licenses, and requirements applicable to HRP while performing the services described in this Agreement. HRP shall be an independent contractor with respect to the services rendered under this Agreement, and no other relationship shall exist or be deemed to exist between HRP and the Client. During the performance of services called for in this Agreement, HRP shall be responsible for exercising that degree of skill and care as is the generally accepted professional practice of other engineers undertaking similar services at the same time and in the same geographical area. HRP's work product is also subject to certain limitations which are described in HRP's report(s) provided in connection with the Proposal, and are incorporated herein by reference. Notwithstanding anything herein or elsewhere to the contrary, the total liability of HRP and its officers, directors, employees, and agents arising out of this Agreement is limited to $50,000 or the total compensation received by HRP under this Agreement, whichever is greater.

HRP's insurance policies do not cover HRP's defense against claims alleging damage caused by a release of pollutants as a result of HRP's work. Since HRP is normally engaged in efforts to stop/reduce the release of pollutants to the environment and is not the originator of any pollutants, it cannot and does not accept any responsibility for damages that may result from a release or migration of existing pollutants that may be associated with the work performed at or associated with the Client's work site or premises.

When work performed by HRP or HRP's subcontractors pursuant to the Proposal involves subsurface (subterranean) investigations, explorations, and/or excavations of any type (below ground surface, paved surfaces, graded surfaces or floors), HRP will contact the appropriate Call Before You Dig organization to obtain utility mark outs as are customarily provided through such services and review plans and information provided by the Client. If a private utility mark-out service is necessary to assure utility clearance, the Client agrees to pay for such service in addition to the cost of the Proposal. In any event, provided HRP is not grossly negligent, HRP will not be responsible for any losses, damages, injuries, or interference to or with any subsurface structure, utility, tank system or system component, pipe, cable, or any other improvements (collectively, "Subsurface Features") if they are not brought to HRP's attention before the commencement of work and/or which are not clearly and accurately physically located on the ground by the Client, such mark-out service or any other public or private utility, agency, company, or individual.

The Client recognizes that disturbances to vegetation, terrain, drainage, paved surfaces and other structures, improvements and equipment will result from the use of exploration or excavation equipment. HRP will use reasonable precautions to minimize such damage, but cost of restoration of such damage is not included in the Proposal and the Client will not hold HRP liable for such disturbances, effects or damages arising from such subsurface investigation, exploration or excavation work performed by HRP or HRP's subcontractors pursuant to this Agreement.

HRP shall maintain the following insurance in force at all times:

    Worker's Compensation Insurance, including Employer's Liability, with a limit of at least $500,000.
    Comprehensive Liability Insurance with limits of at least $1,000,000 per occurrence for bodily injury & property damage.
    Automobile Liability Insurance with minimum limits of: Bodily Injury & Property Damage – Combined single limit $1,000,000.
    Combined Contractor's Pollution and Professional Liability with $5,000,000 per occurrence and $5,000,000 aggregate, claims made basis.

6.    **THE CLIENT'S RESPONSIBILITIES:** The Client is required to appoint an individual who shall be authorized to act on behalf of the Client, with whom HRP can confer, and whose instructions, decisions and consent will be binding on the Client. The Client will also obtain all required permits and approvals necessary for performance of the Proposal; provide HRP with access to all available information pertinent to the project including all maps, drawings and records; reveal to HRP all facts that may be relevant to or have a bearing on the work (and HRP shall be entitled to rely on same); assist HRP in obtaining access to all public and private lands and/or records that may be required to perform the work; and promptly notify HRP, at the earliest opportunity, when and if the Client determines portions of the work are not being performed with customary skill and care. The Client or another party designated by the Client shall be responsible for all waste generated by HRP's activities, including the responsibility to sign manifests, bills of lading, or other shipping documents.

7.    **DOCUMENTS:** All reports, boring logs, field notes, laboratory data, calculations, research and other documents and information prepared by HRP or its subcontractors are instruments of service and shall remain the sole property of HRP. Such documents and information are delivered to the Client, are for the Client's use only, and are not to be relied upon by any other party, unless agreed to by HRP in writing.

8.    **TERMINATION PROVISIONS:** Either party may terminate this Agreement upon thirty (30) days written notice, provided termination by the Client shall not be effective unless and until the Client has paid HRP for the work performed up to the point of termination.

9.    **ARBITRATION:** Any controversy or claim relating to or arising out of this Agreement, or the breach thereof, shall be settled by Arbitration in the City of Hartford, Connecticut, in accordance with the then current rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. Any claim brought by the Client against HRP shall be brought no later than one year after the date of substantial completion of HRP's services hereunder or the expiration of the applicable statute of limitations, whichever is earlier.

10.    **HAZARD COMMUNICATION:** Part of the services to be provided by HRP may involve the use or storage of certain chemicals such as cleaning/decontamination fluids, sample preservatives, and/or gas chromatograph standards. It is expected that no special precautionary measures will need to be taken to protect the Client's employees from these chemicals during normal operating conditions or unforeseeable emergencies, as relatively small amounts of these chemicals will be present. Material Safety Data Sheets for such chemicals are available upon request.

11.    **INDEMNIFICATION:** The Client does hereby agree to defend, indemnify and save HRP, its officers, directors, employees, agents, subcontractors and affiliates from and against all claims, suits, fines, penalties, and attorneys fees (all of the foregoing, collectively, "Claims") that arise out of or are related to this Agreement and the services provided hereunder, including, without limitation, Claims involving access to the site, Subsurface Features, generation of waste, hazardous materials brought on site, and pre-existing and/or migration of hazardous substances and materials, except to the extent caused by HRP's gross negligence.

12.    **FORCE MAJEURE:** HRP shall be excused for the period of any delay in the performance of any obligations hereunder, when prevented by doing so by cause or causes beyond HRP's reasonable control, which shall include, without limitation, all labor disputes, civil commotion, war, warlike operation, invasion, rebellion, hostilities, military or usurped power, terrorism, government regulations or controls, inability to obtain any material or services or acceptable substitute therefor, or through acts of God.

13.    **MISCELLANEOUS:** This Agreement contains the complete understanding between HRP and the Client with respect to the work to be performed. These Terms and Conditions shall govern over any inconsistent provisions in the Proposal, unless a particular term or condition is specifically revoked or amended in the Proposal. This Agreement may not be changed or modified except in writing, and when signed by both parties. This Agreement shall be executed in the State of Connecticut and shall be interpreted and enforced according to the laws of the State of Connecticut. This Agreement may not be assigned by either party without the other's consent. In the event of any litigation, the parties waive trial by jury. In the event any term or provision of this Agreement is deemed invalid, the remaining terms and provisions shall apply. The person signing this Agreement represents that the execution of this Agreement have been duly authorized by the Client and such person has the authority to sign. The headings of this Agreement are for convenience only and shall not limit or enlarge the meaning of the language of this Agreement. The failure by either party to enforce against the other any term or provision of this Agreement shall not be deemed to be a waiver of such party's right to enforce against the other party the same or any other such term or provision in the future. The Proposal is valid for a period of sixty (60) days. This Agreement shall not constitute an offer and shall only be binding on HRP when executed by HRP.

**ACCEPTED FOR CLIENT:**                                 **ACCEPTED FOR HRP:**

Signature of Authorized Representative                      Signature of Authorized Representative

Name: MEMBER                                   Name: R. HLENEY

Title:                                           Title: PRESIDENT/CEO

Date: 1/17/07                                    Date: 4-19-07

N:\Anchor Reef T&C, 1-15-2007.doc

rev. 01/12/2006

# HRP *Associates, Inc.*

*Creating the Right Solutions Together*

January 15, 2007

**CONNECTICUT**
197 Scott Swamp Road
Farmington, CT 06032
800-246-9021
860-674-9570
FAX 860-674-9624

**NEW YORK**
100 Saratoga Village Blvd.
Suite 27
Malta, NY 12020
888-823-6427
518-899-3011
FAX 518-899-8129

**PENNSYLVANIA**
4811 Jonestown Road
Suite 235
Harrisburg, PA 17109
866-232-9824
717-920-1350
FAX 717-920-1353

**SOUTH CAROLINA**
1327 Miller Road
Suite D
Greenville, SC 29607
800-752-3922
864-289-0311
FAX 864-281-9846

Mr. Jason J. Ziegler
Anchor Reef Club at Branford, LLC
60 Popieluszko Court
Hartford, CT 06112

RE: **PROPOSAL FOR ADDITIONAL EVALUATION OF RESIDUE, BASEMENT OF BUILDING NO. 4, ANCHOR REEF CLUB AT BRANFORD, 60 MAPLE STREET, BRANFORD, CT (HRP #BA60.PR)**

Dear Mr. Ziegler:

HRP Associates, Inc. (HRP) is pleased to submit this proposal to conduct additional evaluation of the residue present in the basement of Building No. 4, 60 Maple Street, Branford, CT. As you know, initial sampling identified several constituents of concern (COCs) in the residue, including extractable total petroleum hydrocarbons (ETPH), semi-volatile organic compounds (SVOCs), asbestos, and metals (arsenic, mercury, and lead). Preliminary cost estimates to clean the entire basement ranged form $120,000 to $250,000. The purpose of the proposed additional evaluation is to determine whether or not these COCs are present in residue throughout the basement area or isolated to the initial sampling areas. The proposed work includes a summary report and an evaluation of the options for handling identified impacted residue. Specifically, this proposal includes the following three tasks.

- Collection and laboratory analysis of residue samples
- Evaluation of mitigation options
- Preparation of a summary report

The following sections provide a description of the work, and include cost estimates for each task.

## SCOPE OF SERVICES

## Task 1: Collection and Analysis of Residue Samples

Under this task, HRP will identify proposed residue sampling locations and mark them out in the basement of Building No. 4. Due to the potential for flooding in the basement, sample locations will be marked with painted wooden stakes or cement blocks. Sample locations will be selected to delineate previously identified contamination and investigate remaining portions of the basement. One water sample and one residue sample will be collected from the sump to characterize discharge waters. In addition, HRP will collect

www.hrpassociates.com

- Due Diligence
- Site Investigations
- Brownfields Redevelopment
- Remedial/Corrective Action
- Civil Engineering
- Land Surveying
- Site Planning
- Environmental Permitting
- Hazardous Waste Management
- Air Quality & Pollution Control
- Water & Wastewater Management
- Health & Safety
- Environmental Management System

Mr. Jason Ziegler
Page 2
January 15, 2007

a bulk sample of suspect asbestos piping insulation in the pipe chase located in the northwest corner of the building and a sample of paint in poor condition on structural steel beams. Residue samples will be collected directly into clean sample jars at each location. Each residue sample will be analyzed by a State certified laboratory for the presence of asbestos and TCLP lead. Selected residue samples will also be analyzed for ETPH, SVOCs, and total and SPLP metals (i.e., lead, arsenic, and mercury). The water and residue samples collected from the sump will be analyzed for each COC.

## Task 2: Evaluation of Mitigation Options

Based on the results of the additional residue sampling, HRP will evaluate appropriate potential options for mitigation of impacted residue in the basement of Building No. 4 and make recommendations to Anchor Reef.

## Task 3: Summary Report

HRP will evaluate the data collected and prepare a report detailing the methods and results of the residue sampling. The report will include a description of the residue observed in each sampling area, a site plan showing the sample locations, and all laboratory results.

## PROJECT BUDGET

Tasks related to this contract will be conducted on a time and materials basis in accordance with the "Terms and Conditions" attached. The estimated task by task project budget is listed below.

| | |
|---|---|
| Task 1: Collection and Analysis of Sediment Samples | $ 8,300 |
| Task 2: Evaluation of Mitigation Options | $ 2,500 |
| Task 3: Summary Report | $2,500 |
| **Total Project Estimate:** | **$13,300** |

**HRP** *Associates, Inc.*

*Creating the Right Solutions Together*

Mr. Jason Ziegler
Page 3
February 10, 2004

## AUTHORIZATION TO PROCEED

Before HRP can begin work on this project, we require that you return the **original** copy of the proposal and the **signed original** copy of the attached "Terms and Conditions" authorizing us to proceed with the work described above. Please retain a copy of the original proposal and the signed "Terms and Conditions" for your records.

If you have any questions about this proposal, please do not hesitate to contact HRP Associates, Inc. at (860) 674-9570. Thank you for the opportunity to be of service.

Sincerely,

HRP ASSOCIATES, INC.

John D. Moss
Senior Project Hydrogeologist

Michael S. Swaim
Project Manager

Howard S. Hurd, LEP
Associate Vice President

mss
Attachment

**HRP** *Associates, Inc.*

*Creating the Right Solutions Together*

60 Popieluszko Court
Hartford, CT 06106
Phone: (860) 522-0124
Fax: (860) 547-0506
Cell: (860) 250-3292
E-Mail: dmesite@snet.net

**Milano Corporation, Inc.**

# Fax

| To: | MIKE SWAIM | From: | David A. Mesite |
|---|---|---|---|
| | HRP Assoc. | | Vice President of Development |
| Fax: | 674-9624 | Pages: | 6 |
| Re: | ANCHOR REEF | Date: | 1 17 07 |

☐ Urgent  ☑ For Your Info  ☐ Please Comment  ☐ Please Review  ☐ Please Reply

⊛ **Comments:**

# EXHIBIT B

*AMC 0016-RA*

# TERMS AND CONDITIONS

## HRP *Associates, Inc.*

---

**CLIENT:**  Anchor Reef Club at Branford, LLC                    **DOLLAR VALUE OF PROPOSAL:**  $36,000  (Retainer: $36,000)

**PROPOSAL DATE:**  September 3, 2010                              **SITE LOCATION:**  60 Maple Street, Branford, Connecticut

---

1.  **AGREEMENT AND PARTIES:** HRP Associates, Inc. is referred to herein as HRP. The individual or group to which our Proposal is addressed is hereby referred to as the Client. The Agreement by and between HRP and the Client consists of the scope of services specifically defined in the attached Proposal, any documents that are attached to the Proposal and these Terms and Conditions.

2.  **COMPENSATION:** The costs of basic services to be provided by HRP are specified in the Proposal. HRP will submit invoices to the Client on a monthly basis documenting costs incurred in the previous calendar month including labor charges, laboratory analysis charges, and expenses, as applicable, unless a different billing method is specified in the Proposal. Invoices are due and payable upon receipt by the Client. Interest in the amount of 1½% per month or, if lower, the maximum lawful rate, will be charged on any amounts that are unpaid at the end of thirty (30) calendar days of the invoice date. Invoices not paid within sixty (60) calendar days of the invoice date will result in cessation of work until such invoices rendered are paid in full. In the event payment in full is not received within ninety (90) calendar days of the invoice date, the account shall also be subject to collection by our attorney, and any and all reasonable costs of collection, including reasonable attorney's fees, shall be paid by the Client. Further, HRP reserves the right to sell the work product to any interested party in the event the Client is in default of its payment obligations for a period of greater than ninety (90) days. Payment can be made by check to: **HRP Associates, Inc., 197 Scott Swamp Road, Farmington, Connecticut 06032, Attention: Accounts Receivable**. To arrange payment by credit card (MasterCard or Visa), contact HRP's Accounts Receivable Department at 860-674-9570. Reference to HRP's invoice number should be included with the payment.

3.  **ADDITIONAL CHARGES:** Costs quoted do not include State or local taxes, which will be added to invoices where applicable. The cost for project-related information technology communications, including but not limited to cellular phones, facsimile, and project information technology systems management software and hardware, will be charged at three percent (3%) of the total labor charges for projects billed on a time and materials basis, and is in addition to the specified not-to-exceed cost. The foregoing sentence is not applicable to projects billed on a lump-sum basis. A twenty-five percent (25%) surcharge applies to labor in connection with expert testimony, and such labor will be billed in ½ day increments.

4.  **ADDITIONAL SERVICES:** HRP will not exceed the cost for basic services outlined in the Proposal without the Client's written consent. If authorized by the Client, services provided beyond the basic Scope of Services will be billed on the following basis:

(a)  **Direct Labor Costs** – A specified rate for each category of HRP's personnel, for the time that they actually spent working on the Client's project and for required travel (portal to portal), as documented and certified by HRP. HRP may revise rates from time to time to account for salary adjustments and increased costs. Required and/or client requested overtime is billed at a factor of 1.5 times the hourly rates charged. Overtime is defined as any hours worked beyond eight (8) hours in one day or forty (40) hours in one work week, or on Saturday, Sunday, or an HRP holiday.

(b)  **Laboratory Analysis Charges** – A specified rate for each laboratory analysis parameter beyond those included in the Proposal (where applicable).

(c)  **Expenses** – Where applicable, project-related expenses for travel, meals, overnight delivery, priority mail, outside reproduction, courier services, subcontracting (other than laboratory analysis), material and equipment purchases, and miscellaneous other direct charges are billed at cost plus twenty percent (20%) for handling and administration.

5.  **HRP'S RESPONSIBILITIES:** HRP shall comply with all Federal, State and local laws, ordinances, rules and regulations, permits, licenses, and requirements applicable to HRP while performing the services described in this Agreement. HRP shall be an independent contractor with respect to the services rendered under this Agreement, and no other relationship shall exist or be deemed to exist between HRP and the Client. During the performance of services called for in this Agreement, HRP shall be responsible for exercising that degree of skill and care as is the generally accepted professional practice of other engineers undertaking similar services at the same time and in the same geographical area. HRP's work product is also subject to certain limitations which are described in HRP's report(s) provided in connection with the Proposal, and are incorporated herein by reference. Notwithstanding anything herein or elsewhere to the contrary, the total liability of HRP and its officers, directors, employees, and agents arising out of this Agreement is limited to $50,000 or the total compensation received by HRP under this Agreement, whichever is greater.

HRP's insurance policies do not cover HRP's defense against claims alleging damage caused by a release of pollutants as a result of HRP's work. Since HRP is normally engaged in efforts to stop/reduce the release of pollutants to the environment and is not the originator of any pollutants, it cannot and does not accept any responsibility for damages that may result from a release or migration of existing pollutants that may be associated with the work performed at or associated with the Client's work site or premises.

When work performed by HRP or HRP's subcontractors pursuant to the Proposal involves subsurface (subterranean) investigations, explorations, and/or excavations of any type (below ground surface, paved surfaces, graded surfaces or floors), HRP will contact the appropriate Call Before You Dig organization to obtain utility mark-outs as are customarily provided through such services and review plans and information provided by the Client. If a private utility mark-out service is necessary to assure utility clearance, the Client agrees to pay for such service in addition to the cost of the Proposal.  In any event, provided HRP is not grossly negligent, HRP will not be responsible for any losses, damages, injuries, or interference to or with any subsurface structure, utility, tank system or system component, pipe, cable, or any other improvements (collectively, "Subsurface Features") if they are not brought to HRP's attention before the commencement of work and/or which are not clearly and accurately physically located on the ground by the Client, such mark-out service or any other public or private utility, agency, company, or individual.

The Client recognizes that disturbances to vegetation, terrain, drainage, paved surfaces and other structures, improvements and equipment will result from the use of exploration or excavation equipment. HRP will use reasonable precautions to minimize such damage, but cost of restoration of such damage is not included in the Proposal and the Client will not hold HRP liable for such disturbances, effects or damages arising from such subsurface investigation, exploration or excavation work performed by HRP or HRP's subcontractors pursuant to this Agreement.

HRP shall maintain the following insurance in force at all times:

      Worker's Compensation Insurance, including Employer's Liability, with a limit of at least $500,000.
      Comprehensive Liability Insurance with limits of at least $1,000,000 per occurrence for bodily injury & property damage.
      Automobile Liability Insurance with minimum limits of: Bodily Injury & Property Damage – Combined single limit $1,000,000.
      Combined Contractor's Pollution and Professional Liability with $5,000,000 per occurrence and $5,000,000 aggregate, claims made basis.

6.    **THE CLIENT'S RESPONSIBILITIES:** The Client is required to appoint an individual who shall be authorized to act on behalf of the Client, with whom HRP can confer, and whose instructions, decisions and consent will be binding on the Client. The Client will also obtain all required permits and approvals necessary for performance of the Proposal; provide HRP with access to all available information pertinent to the project including all maps, drawings and records; reveal to HRP all facts that may be relevant to or have a bearing on the work (and HRP shall be entitled to rely on same); assist HRP in obtaining access to all public and private lands and/or records that may be required to perform the work; and promptly notify HRP, at the earliest opportunity, when and if the Client determines portions of the work are not being performed with customary skill and care. The Client or another party designated by the Client shall be responsible for all waste generated by HRP's activities, including the responsibility to sign manifests, bills of lading, or other shipping documents.

7.    **DOCUMENTS:** All reports, boring logs, field notes, laboratory data, calculations, research and other documents and information prepared by HRP or its subcontractors are instruments of service and shall remain the sole property of HRP. Such documents and information are delivered to the Client, are for the Client's use only, and are not to be relied upon by any other party, unless agreed to by HRP in writing.

8.    **TERMINATION PROVISIONS:** Either party may terminate this Agreement upon thirty (30) days written notice, provided termination by the Client shall not be effective unless and until the Client has paid HRP for the work performed up to the point of termination.

9.    **ARBITRATION:** Any controversy or claim relating to or arising out of this Agreement, or the breach thereof, shall be settled by Arbitration in the City of Hartford, Connecticut, in accordance with the then current rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. Any claim brought by the Client against HRP shall be brought no later than one year after the date of substantial completion of HRP's services hereunder or the expiration of the applicable statute of limitations, whichever is earlier.

10.    **HAZARD COMMUNICATION:** Part of the services to be provided by HRP may involve the use or storage of certain chemicals such as cleaning/decontamination fluids, sample preservatives, and/or gas chromatograph standards. It is expected that no special precautionary measures will need to be taken to protect the Client's employees from these chemicals during normal operating conditions or unforeseeable emergencies, as relatively small amounts of these chemicals will be present. Material Safety Data Sheets for such chemicals are available upon request.

11.    **INDEMNIFICATION:** The Client does hereby agree to defend, indemnify and save HRP, its officers, directors, employees, agents, subcontractors and affiliates from and against all claims, suits, fines, penalties, and attorneys fees (all of the foregoing, collectively, "Claims") that arise out of or are related to this Agreement and the services provided hereunder, including, without limitation, Claims involving access to the site, Subsurface Features, generation of waste, hazardous materials brought on site, and pre-existing and/or migration of hazardous substances and materials, except to the extent caused by HRP's gross negligence.

12.    **FORCE MAJEURE:** HRP shall be excused for the period of any delay in the performance of any obligations hereunder, when prevented by doing so by cause or causes beyond HRP's reasonable control, which shall include, without limitation, all labor disputes, civil commotion, war, warlike operation, invasion, rebellion, hostilities, military or usurped power, terrorism, government regulations or controls, inability to obtain any material or services or acceptable substitute therefor, or through acts of God.

13.    **MISCELLANEOUS:** This Agreement contains the complete understanding between HRP and the Client with respect to the work to be performed. These Terms and Conditions shall govern over any inconsistent provisions in the Proposal, unless a particular term or condition is specifically revoked or amended in the Proposal. This Agreement may not be changed or modified except in writing, and when signed by both parties. This Agreement shall be executed in the State of Connecticut and shall be interpreted and enforced according to the laws of the State of Connecticut. This Agreement may not be assigned by either party without the other's consent. In the event of any litigation, the parties waive trial by jury. In the event any term or provision of this Agreement is deemed invalid, the remaining terms and provisions shall apply. The person signing this Agreement represents that the execution of this Agreement have been duly authorized by the Client and such person has the authority to sign. The headings of this Agreement are for convenience only and shall not limit or enlarge the meaning of the language of this Agreement. The failure by either party to enforce against the other any term or provision of this Agreement shall not be deemed to be a waiver of such party's right to enforce against the other party the same or any other such term or provision in the future. The Proposal is valid for a period of sixty (60) days. This Agreement shall not constitute an offer and shall only be binding on HRP when executed by HRP.

*ACCEPTED FOR CLIENT:*                               *ACCEPTED FOR HRP:*

_____               _____
  Signature of Authorized Representative            Signature of Authorized Representative

Name:  _Jason Ziegler_                    Name:  _Howard Hurd_

Title:  _Member_                          Title:  _Principal_

Date:  _8/4/10_                             Date:  _9/5/10_

# HRP *Associates, Inc.*

*Creating the Right Solutions Together*

September 3, 2010

Jason Ziegler
Anchor Reef Club at Branford, LLC
60 Maple Street
Branford, Connecticut  06405

RE:    UPDATED PROPOSAL FOR REMEDIATION OF SOILS EXCEEDING 1.0
PPM PCBS, ANCHOR REEF AT BRANFORD, LLC, 60 MAPLE STREET,
BRANFORD, CONNECTICUT  (HRP #ANC0007.RA)

Dear Mr. Ziegler:

HRP Associates, Inc. (HRP) is pleased to submit the following proposal to remedi-
ate soils within five areas on-site with identified concentrations of PCBs exceeding
1 part per million (ppm).  This cost proposal is based on the results of the Phase II
subsurface investigation, Phase III subsurface investigation, and remedial area of
concern (RAC) remediations.  A similar proposal dated November 15, 2004 was
previously submitted for the remediation of PCB contaminated soils.  However,
several tasks outlined in the initial proposal have been completed since it was
issued in November of 2004.  As such, HRP has updated the scope of work and
associated costs to include only those remaining tasks necessary to remediate
soils with identified PCB concentrations exceeding 1.0 ppm.

You may recall that a revised proposal was also provided to you in January 2006.
The scope of services included herein is similar to the January 2006 proposal, with
the following two exceptions:

1.  We have assumed that the PCB remediation waste in the vicinity of AOC-
    27 will be included in the subject remedial excavations

2.  We have increased the number of post-remediation confirmatory soil sam-
    ples, added up to 20 confirmatory samples for SPLP analysis to evaluate
    compliance with the PMC, and added 20 PCB wipe samples from the steel
    piles that will be required pursuant to EPA regulations

3.  We have increased the estimated number of field days to 5

The Code of Federal Regulations (CFR), title 40 (Protection of Environment), part
761 (Polychlorinated biphenyls [PCBs] manufacturing, processing, distribution in
commerce, and use prohibitions), also referred to as '40 CFR 761', defines "PCB
Remediation Waste", in part, as a waste containing PCBs as a result of a spill,
release, or other unauthorized disposal.  The presumed source(s) including the
historical presence of transformers and capacitors on-site and the presumed timing
of the release(s) are also consistent with the definition.  Therefore, it is HRP's
opinion that the identified PCB contamination on-site meets the definition of "PCB
Remediation Waste".

**CONNECTICUT**

197 Scott Swamp Road
Farmington, CT  06032
800-246-9021
860-674-9570
FAX 860-674-9624

999 Oronoque Lane
Suite 102
Stratford, CT  06614
203-380-1395
FAX 203-380-1438

**FLORIDA**

2435 U.S. Highway 19
Suite 550
Holiday, FL  34691
727-942-2115
FAX 727-942-2113

**INDIANA**

7965 East 106th Street
Suite 116
Fishers, IN  46038
317-570-4851
FAX 317-570-4852

**NEW YORK**

1 Fairchild Square
Suite 110
Clifton Park, NY  12065
888-823-6427
518-877-7101
FAX 518-877-8561

**SOUTH CAROLINA**

1327 Miller Road
Suite D
Greenville, SC  29607
800-752-3922
864-289-0311
FAX 864-281-9846

**TEXAS**

Fort Worth Center
5601 Bridge Street
Suite 300
Fort Worth, TX  76112
817-492-7092
FAX 817-492-7001

www.hrpassociates.com

I:\PROPOSALS\WAnchor Reef\PCB Remediation Proposal (rev Sept 2010).doc

Mr. Jason Ziegler
September 3, 2010
Page 2

As outlined in 40 CFR 761.61, self-implementing PCB remediation is subject to the following notifications / certifications:

1) At least 30 days prior to the date that the cleanup begins, the owner of the property shall notify, in writing, the EPA Regional Administrator, the director of the CT DEP, and the director of the county or local environmental protection agency where the cleanup will be conducted.  The notice shall include:

   (a)  The nature of the contamination, including kinds of materials contaminated;

   (b)  A summary of the procedures used to sample contaminated and adjacent areas and a table or cleanup site map showing PCB concentrations measured in all pre-cleanup characterization samples.  The summary must include sample collection and analysis dates;

   (c)  The location and extent of the identified contaminated area, including topographic maps with sample collection sites cross references to the sample identification numbers in the data summary;

   (d)  A cleanup plan for the site, including schedule, disposal technology, and approach.  This plan should contain options and contingencies to be used if unanticipated higher concentrations or wider distributions of PCB remediation waste are found or other obstacles force changes in the cleanup approach; and

   (e)  A written certification, signed by the owner of the property, that all sampling plans, sample collection procedures, and instrumental/chemical analysis procedures used to assess or characterize the PCB contamination, are on file at the location designated in the certificate, and are available for EPA inspection.

2) Within 30 calendar days of receiving notification, the EPA Regional Administrator will respond in writing approving of the self-implementing cleanup, disapproving of the self-implementing cleanup, or requiring additional information.  If no response is received within 30 calendar days it may be assumed that the notification is complete and it is acceptable to proceed with the cleanup in accordance with the information provided to the EPA Regional Administrator.  Once cleanup is underway, any proposed changes from the notification must be provided to the EPA Regional Administrator in writing no less than 14 calendar days prior to the proposed implementation of the change.  The EPA Regional Administrator will determine, at his or her discretion, whether to accept the change and will respond to the change notification verbally within 7 calendar days and in writing within 14 calendar days of receiving it.  If the EPA Regional Administrator does not respond within these times, the proposed change may be deemed complete and acceptable and the cleanup may proceed in accordance with the information on the change notice.

A written notice of proposed cleanup plans for the removal of "PCB Remediation Waste" was provided to the EPA Regional Administrator, the director of the CT DEP, and the Director of Health at the Town of Branford on December 14, 2005.  No responses were received within 30 calendar days so it is assumed that the notification is complete and it is acceptable to proceed with the cleanup in accordance with the information provided to the EPA Regional Administrator.  EPA later sent a PCB Disposal Approval under §761.61(a) letter for the project, dated September 20, 2006.

**HRP** *Associates, Inc.*                                    *Creating the Right Solutions Together*

Mr. Jason Ziegler
September 3, 2010
Page 3

This proposed remediation will include the excavation and off-site disposal of identified PCB contamination exceeding 1.0 ppm and the collection of confirmatory soil samples to document the complete removal of PCB contamination. 40 CFR 761.283 requires the collection of a minimum of three confirmatory soil samples at each remediation location. In addition, sidewall samples should be collected every 5 feet and bottom samples should be collected using a 5-foot spacing grid system (i.e. one sample per 25 square feet).

## PROPOSED SERVICES AND PROJECT BUDGET

The proposed services and estimated cost for this project are presented below. All work will be performed on a time and materials basis, which shall not exceed the total estimated project cost presented below. All work and associated costs that will exceed the total estimated project cost will be pre-approved by the client. The proposed project budget will be revised as data indicates, subject to client approval. Meetings and other associated administration tasks are not included in the proposed cost estimate presented herein and will be billed separately. Scope Modification forms presenting additional costs associated with any extra work not explicitly detailed in this proposal will be provided to the client for review and approval as required.

### Task One:  Discuss Remedial Strategy with CT DEP & EPA

HRP will contact Lori Saliby in the Bureau of Waste Management PCB Program at the CT DEP and/or Paul Jameson in the Bureau of Waste Management at the CT DEP to discuss site-specific details regarding the CT DEP's opinion on the presence of PCB remediation waste on-site. If the CT DEP determines that a remedial strategy and/or remedial standards that differ from the EPA guidelines are appropriate for the site, they will be implemented. Otherwise, if the CT DEP agrees with HRP's interpretation that the on-site PCB contamination meets the definition of PCB Remediation Waste, the remedial strategy proposed herein will be implemented.

### Task Two:  Remediation Oversight of PCB Contaminated Soils

A total of 5 areas with PCB concentrations exceeding 1.0 ppm have been identified within the proposed Phase I development area. Soils will either be direct loaded for immediate disposal or stockpiled on-site for subsequent disposal. Excavating, loading, and transporting of soils will be completed by the client under a direct contract with his subcontractors. The laboratory fees and fees for HRP supervision listed below are for the first stage of excavation. If additional excavation is required to remove newly identified soil with PCB concentrations exceeding appropriate standards, additional costs will be incurred. Scope Modification forms presenting additional costs associated with any extra work not explicitly detailed in this proposal will be provided to the client for review and approval as required.

-- Excavator and Crew provided by client          **Direct Contract to Client**
-- HRP Supervision for up to 5 days, materials, and travel*      $  10,000
-- Laboratory fees (220 confirmatory soil samples for PCB analysis using the Soxhlet extraction method; 20 confirmatory samples for PCB analysis using the SPLP extraction method; and up to 20 piling wipe samples for PCB analysis using the Soxhlet extraction method)      $  14,000

                            **Sub Total**   $  24,000

**HRP** *Associates, Inc.*             *Creating the Right Solutions Together*

L:\PRCPOSALS\A\Anchor Reef-PCB Remediation Proposal (rev Sept 2010).doc

Mr. Jason Ziegler
September 3, 2010
Page 4


*The provided supervision costs assume that no more than 260 confirmatory samples will be collected. If additional confirmatory samples are required, then additional supervision costs will be incurred on a time and materials basis.*

Note that the initial proposal that was submitted to complete this work dated November 15, 2004 included two days of HRP supervision for the excavation of PCB contaminated soils. HRP has increased the number of field days from two to five based on current site conditions and the anticipated need to excavate soil from around foundation piles installed for the construction of Building #2.

### Task Three:  Excavation/Sampling Point Location Survey

Task three provides for a complete survey of all excavation and/or sampling locations in relation to the State Plane Coordinate system and NGVD by a Connecticut licensed land surveyor. Excavation and sample locations will be marked at the time of remediation to assist in the subsequent survey efforts. The survey will be performed to incorporate the location of each sampling point into the existing project mapping. This task is critical for documenting complete removal of PCB contaminated soils. These services will be provided by the client under a direct contract with his surveyor.

– Surveyor provided by client                                    **Direct Contract to Client**


### Task Four:  Data Analysis, Reporting and Project Management

This task includes analysis and interpretation of all the data collected during the course of the remediation, including all the analytical data produced by the laboratory. The CT DEP Remediation Standard Regulation (RSR) default numerical comparison criteria will be used as a standard for analysis of laboratory data derived from the collected soil samples. In addition the laboratory results will be compared to the remediation goal of 1 ppm. A letter report documenting the results of the remediation will be prepared. The report will include detailed maps that depict the location of all surveyed sampling points.

An HRP Project Manager will oversee all phases of the project and maintain close contact with the project progress and results. The Project Manager will review the work, the progress of the on-site work, and the data evaluation. Lastly, the Project Manager will review the draft and final versions of the project report for organization, clarity, and technical content prior to submission.

| | |
|---|---:|
| – Data Analysis | $  3,000 |
| – Report Preparation | $  5,000 |
| – Project Management | $  4,000 |
| **Sub Total** | $  12,000 |

### TOTAL UPDATED PCB REMEDIATION PROJECT COST ESTIMATE          $  36,000


**HRP** *Associates, Inc.*                          *Creating the Right Solutions Together*

C:\PROPOSALS\Anchor Reef-PCB Remediation Proposal (rev Sept 2010).doc

Mr. Jason Ziegler
September 3, 2010
Page 5

## PROJECT SCHEDULE

HRP anticipates that the first round of excavations for PCB remediation can be completed within 4 to 6 weeks of approval to begin work. This schedule includes a standard laboratory turn around time of 7-10 business days and does not include any priority analysis. If needed by the client, HRP can submit a formal schedule with fixed dates for completion of the specific investigations proposed herein.

## AUTHORIZATION TO PROCEED

HRP can begin the proposed work immediately, subject to client approval.  Before HRP can begin work on this project, we require that you return the **original** copy of the proposal and the **signed original** copy of the attached "Terms and Conditions" authorizing us to proceed with the work described above.  Please retain a copy of the original proposal and the signed "Terms and Conditions" for your records.

In addition, a retainer of $36,000 is requested prior to the start of the project.

We hope this proposal meets with your approval.  If you have any questions regarding this proposal, please do not hesitate to contact HRP at (203) 380-1395.  Thank you for the opportunity to be of service.

Sincerely,

HRP ASSOCIATES, INC.

Jason A. Beach
Project Manager

Daniel D. Titus, LEP
Regional Manager

Howard S. Hurd, CPG, LEP
Principal

Attachment

**HRP** *Associates, Inc.*

*Creating the Right Solutions Together*

I:\PROPOSALS\A\Anchor Reel-PCB Remediation Proposal (rev Sept 2010).doc

# EXHIBIT C

*ANC0017.CE*

# TERMS AND CONDITIONS

## HRP *Associates, Inc.*

| | |
|---|---|
| **CLIENT:** Anchor Reef Club at Branford, LLC | **DOLLAR VALUE OF PROPOSAL:** $9,450.00 (RETAINER: $9,450.00) |
| **PROPOSAL DATE:** May 11, 2012 | **SITE LOCATION:** 60 Maple Street, Branford, CT |

1. **AGREEMENT AND PARTIES:** HRP Associates, Inc. is referred to herein as HRP. The individual or group to which our Proposal is addressed is hereby referred to as the Client. The Agreement by and between HRP and the Client consists of the scope of services specifically defined in the attached Proposal, any documents that are attached to the Proposal and these Terms and Conditions.

2. **COMPENSATION:** The costs of basic services to be provided by HRP are specified in the Proposal. HRP will submit invoices to the Client on a monthly basis documenting costs incurred in the previous calendar month including labor charges, laboratory analysis charges, and expenses, as applicable, unless a different billing method is specified in the Proposal. Invoices are due and payable upon receipt by the Client. Interest in the amount of 1½% per month or, if lower, the maximum lawful rate, will be charged on any amounts that are unpaid at the end of thirty (30) calendar days of the invoice date. Invoices not paid within sixty (60) calendar days of the invoice date will result in cessation of work until such invoices rendered are paid in full. In the event payment in full is not received within ninety (90) calendar days of the invoice date, the account shall also be subject to collection by our attorney, and any and all reasonable costs of collection, including reasonable attorney's fees, shall be paid by the Client. Further, HRP reserves the right to sell the work product to any interested party in the event the Client is in default of its payment obligations for a period of greater than ninety (90) days. Payment can be made by check to: **HRP Associates, Inc., 197 Scott Swamp Road, Farmington, Connecticut 06032, Attention: Accounts Receivable.** To arrange payment by credit card (MasterCard or Visa), contact HRP's Accounts Receivable Department at 860-674-9570. Reference to HRP's invoice number should be included with the payment.

3. **ADDITIONAL CHARGES:** Costs quoted do not include State or local taxes, which will be added to invoices where applicable. The cost for project-related information technology communications, including but not limited to cellular phones, facsimile, and project information technology systems management software and hardware, will be charged at three percent (3%) of the total labor charges for projects billed on a time and materials basis, and is in addition to the specified not-to-exceed cost. The foregoing sentence is not applicable to projects billed on a lump-sum basis. A twenty-five percent (25%) surcharge applies to labor in connection with expert testimony, and such labor will be billed in ½ day increments.

4. **ADDITIONAL SERVICES:** HRP will not exceed the cost for basic services outlined in the Proposal without the Client's written consent. If authorized by the Client, services provided beyond the basic Scope of Services will be billed on the following basis:

   (a) **Direct Labor Costs** – A specified rate for each category of HRP's personnel, for the time that they actually spent working on the Client's project and for required travel (portal to portal), as documented and certified by HRP. HRP may revise rates from time to time to account for salary adjustments and increased costs. Required and/or client requested overtime is billed at a factor of 1.5 times the hourly rates charged. Overtime is defined as any hours worked beyond eight (8) hours in one day or forty (40) hours in one work week, or on Saturday, Sunday, or an HRP holiday.

   (b) **Laboratory Analysis Charges** – A specified rate for each laboratory analysis parameter beyond those included in the Proposal (where applicable).

   (c) **Expenses** – Where applicable, project-related expenses for travel, meals, overnight delivery, priority mail, outside reproduction, courier services, subcontracting (other than laboratory analysis), material and equipment purchases, and miscellaneous other direct charges are billed at cost plus twenty percent (20%) for handling and administration.

5. **HRP'S RESPONSIBILITIES:** HRP shall comply with all Federal, State and local laws, ordinances, rules and regulations, permits, licenses, and requirements applicable to HRP while performing the services described in this Agreement. HRP shall be an independent contractor with respect to the services rendered under this Agreement, and no other relationship shall exist or be deemed to exist between HRP and the Client. During the performance of services called for in this Agreement, HRP shall be responsible for exercising that degree of skill and care as is the generally accepted professional practice of other engineers undertaking similar services at the same time and in the same geographical area. HRP's work product is also subject to certain limitations which are described in HRP's report(s) provided in connection with the Proposal, and are incorporated herein by reference. Notwithstanding anything herein or elsewhere to the contrary, the total liability of HRP and its officers, directors, employees, and agents arising out of this Agreement is limited to $50,000 or the total compensation received by HRP under this Agreement, whichever is greater.

HRP's insurance policies do not cover HRP's defense against claims alleging damage caused by a release of pollutants as a result of HRP's work. Since HRP is normally engaged in efforts to stop/reduce the release of pollutants to the environment and is not the originator of any pollutants, it cannot and does not accept any responsibility for damages that may result from a release or migration of existing pollutants that may be associated with the work performed at or associated with the Client's work site or premises.

When work performed by HRP or HRP's subcontractors pursuant to the Proposal involves subsurface (subterranean) investigations, explorations, and/or excavations of any type (below ground surface, paved surfaces, graded surfaces or floors), HRP will contact the appropriate Call Before You Dig organization to obtain utility mark outs as are customarily provided through such services and review plans and information provided by the Client. If a private utility mark-out service is necessary to assure utility clearance, the Client agrees to pay for such service in addition to the cost of the Proposal. In any event, provided HRP is not grossly negligent, HRP will not be responsible for any losses, damages, injuries, or interference to or with any subsurface structure, utility, tank system or system component, pipe, cable, or any other improvements (collectively, "Subsurface Features") if they are not brought to HRP's attention before the commencement of work and/or which are not clearly and accurately physically located on the ground by the Client, such mark-out service or any other public or private utility, agency, company, or individual.

The Client recognizes that disturbances to vegetation, terrain, drainage, paved surfaces and other structures, improvements and equipment will result from the use of exploration or excavation equipment. HRP will use reasonable precautions to minimize such damage, but cost of restoration of such damage is not included in the Proposal and the Client will not hold HRP liable for such disturbances, effects or damages arising from such subsurface investigation, exploration or excavation work performed by HRP or HRP's subcontractors pursuant to this Agreement.

HRP shall maintain the following insurance in force at all times:

> Worker's Compensation Insurance, including Employer's Liability, with a limit of at least $500,000.
> Comprehensive Liability Insurance with limits of at least $1,000,000 per occurrence for bodily injury & property damage.
> Automobile Liability Insurance with minimum limits of: Bodily Injury & Property Damage — Combined single limit $1,000,000.
> Combined Contractor's Pollution and Professional Liability with $5,000,000 per occurrence and $5,000,000 aggregate, claims made basis.

6.  **THE CLIENT'S RESPONSIBILITIES:** The Client is required to appoint an individual who shall be authorized to act on behalf of the Client, with whom HRP can confer, and whose instructions, decisions and consent will be binding on the Client. The Client will also obtain all required permits and approvals necessary for performance of the Proposal; provide HRP with access to all available information pertinent to the project including all maps, drawings and records; reveal to HRP all facts that may be relevant to or have a bearing on the work (and HRP shall be entitled to rely on same); assist HRP in obtaining access to all public and private lands and/or records that may be required to perform the work; and promptly notify HRP, at the earliest opportunity, when and if the Client determines portions of the work are not being performed with customary skill and care. The Client or another party designated by the Client shall be responsible for all waste generated by HRP's activities, including the responsibility to sign manifests, bills of lading, or other shipping documents.

7.  **DOCUMENTS:** All reports, boring logs, field notes, laboratory data, calculations, research and other documents and information prepared by HRP or its subcontractors are instruments of service and shall remain the sole property of HRP. Such documents and information are delivered to the Client, are for the Client's use only, and are not to be relied upon by any other party, unless agreed to by HRP in writing.

8.  **TERMINATION PROVISIONS:** Either party may terminate this Agreement upon thirty (30) days written notice, provided termination by the Client shall not be effective unless and until the Client has paid HRP for the work performed up to the point of termination.

9.  **ARBITRATION:** Any controversy or claim relating to or arising out of this Agreement, or the breach thereof, shall be settled by Arbitration in the City of Hartford, Connecticut, in accordance with the then current rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. Any claim brought by the Client against HRP shall be brought no later than one year after the date of substantial completion of HRP's services hereunder or the expiration of the applicable statute of limitations, whichever is earlier.

10. **HAZARD COMMUNICATION:** Part of the services to be provided by HRP may involve the use or storage of certain chemicals such as cleaning/decontamination fluids, sample preservatives, and/or gas chromatograph standards. It is expected that no special precautionary measures will need to be taken to protect the Client's employees from these chemicals during normal operating conditions or unforeseeable emergencies, as relatively small amounts of these chemicals will be present. Material Safety Data Sheets for such chemicals are available upon request.

11. **INDEMNIFICATION:** The Client does hereby agree to defend, indemnify and save HRP, its officers, directors, employees, agents, subcontractors and affiliates from and against all claims, suits, fines, penalties, and attorneys fees (all of the foregoing, collectively, "Claims") that arise out of or are related to this Agreement and the services provided hereunder, including, without limitation, Claims involving access to the site, Subsurface Features, generation of waste, hazardous materials brought on site, and pre-existing and/or migration of hazardous substances and materials, except to the extent caused by HRP's gross negligence.

12. **FORCE MAJEURE:** HRP shall be excused for the period of any delay in the performance of any obligations hereunder, when prevented by doing so by cause or causes beyond HRP's reasonable control, which shall include, without limitation, all labor disputes, civil commotion, war, warlike operation, invasion, rebellion, hostilities, military or usurped power, terrorism, government regulations or controls, inability to obtain any material or services or acceptable substitute therefor, or through acts of God.

13. **MISCELLANEOUS:** This Agreement contains the complete understanding between HRP and the Client with respect to the work to be performed. These Terms and Conditions shall govern over any inconsistent provisions in the Proposal, unless a particular term or condition is specifically revoked or amended in the Proposal. This Agreement may not be changed or modified except in writing, and when signed by both parties. This Agreement shall be executed in the State of Connecticut and shall be interpreted and enforced according to the laws of the State of Connecticut. This Agreement may not be assigned by either party without the other's consent. In the event of any litigation, the parties waive trial by jury. In the event any term or provision of this Agreement is deemed invalid, the remaining terms and provisions shall apply. The person signing this Agreement represents that the execution of this Agreement have been duly authorized by the Client and such person has the authority to sign. The headings of this Agreement are for convenience only and shall not limit or enlarge the meaning of the language of this Agreement. The failure by either party to enforce against the other any term or provision of this Agreement shall not be deemed to be a waiver of such party's right to enforce against the other party the same or any other such term or provision in the future. The Proposal is valid for a period of sixty (60) days. This Agreement shall not constitute an offer and shall only be binding on HRP when executed by HRP.

ACCEPTED FOR CLIENT:                                    ACCEPTED FOR HRP:

_____                        _____
Signature of Authorized Representative                 Signature of Authorized Representative

Name:  Jason Ziegler                                   Name:  Howard Hird

Title: Manager                                         Title: COO

Date:  6/12/12                                          Date:  6/12/12

N:\Anchor Reef_Site Planning-egf T&C.doc              Page 2 of 2                          rev. 6/1/2007

# HRP *Associates, Inc.*

*Creating the Right Solutions Together*

May 11, 2012

Jason Ziegler
Anchor Reef Club at Branford, LLC
60 Maple Street
Branford, Connecticut 06405

RE:  **PROPOSAL FOR PERFORMING CIVIL ENGINEERING SERVICES, PHASE
II CONSTRUCTION, ANCHOR REEF, BRANFORD, CT (HRP #CE60.PR)**

Dear Mr. Ziegler:

HRP Associates, Inc. (HRP) is pleased to submit this proposal to perform civil
engineering services to support the architectural design and site planning services
for the Phase II construction at the Anchor Reef development in Branford, CT.

## SCOPE OF SERVICES

### Task 1: Coastal Area Management Permit Documents

HRP will complete the required information on the Town of Old Saybrook's
Application for Review of Coastal Site Plans. The coastal resources that are
identified to be on and/or contiguous (within 100 feet) to the site will be depicted
on the project plans. A project narrative will be included which outlines how the
proposed project complies with the CT-DEEP's – *Connecticut Coastal
Management Manual.* HRP will fill out the Town's Application on its prescribed
forms.

This proposal does not include coordination with the CT-DEEP Office of Long
Island Sound Programs.

### Task 2: Site Permitting Plans

HRP will update the Civil Engineering Construction Plans based upon the revised
Site Master Plan and Base Mapping being prepared by Friar Associates and as-
built conditions surveyed by the Bongiovanni Group. The documents will depict
the work that that will be completed on the site for the construction of buildings
#2 and #3 at the site. The Civil Plan set will include Site Grading, Site Utilities,
and an Erosion Control Plan as required by the Town of Branford's Zoning
Regulations.

**CONNECTICUT**

Corporate Headquarters
197 Scott Swamp Road
Farmington, CT 06032
800-246-9021
860-674-9570
FAX 860-674-9624

999 Oronoque Lane
Second Floor
Stratford, CT 06614
203-380-1395
FAX 203-380-1438

**FLORIDA**

1817 Cypress Brook Drive
Suite 103
New Port Richey, FL 34655
888-341-7244
727-375-2323
FAX 727-375-2311

**MASSACHUSETTS**

7 Midstate Drive
Suite 201
Auburn, MA 01501
855-866-3934
508-407-0009
FAX 508-407-0012

**NEW YORK**

1 Fairchild Square
Suite 110
Clifton Park, NY 12065
888-823-6427
518-877-7101
FAX 518-877-8561

**SOUTH CAROLINA**

1327 Miller Road
Suite D
Greenville, SC 29607
800-752-3922
864-269-0311
FAX 864-281-9846

**TEXAS**

P.O. Box 191329
Dallas, TX 75219
800-752-3922
FAX 864-281-9846

www.hrpassociates.com

Mr. Jason Ziegler
May 11, 2012
Page 2

**Task 3: Drainage Calculations**

Based upon revisions to the site layout, HRP will update and revise the existing drainage calculations for submittal to the Planning & Zoning Commission in support of the Site Plan permit.

**Task 4: Project Meetings**

Under this task, HRP will attend up to three (3) project meetings with the local officials and three (3) hearings in support of this project.

At the client's request, HRP will attend additional meetings on a lump sum basis of **$350.00** per meeting.

**PROJECT BUDGET**

The following budget is proposed for this work in accordance with the scope of work outlined above.

| | | |
|---|---|---|
| Task 1: | Coastal Area Management Permitting | $ 2,000 |
| Task 2: | Site Permitting Plans | $ 3,000 |
| Task 3: | Drainage Calculations | $ 1,950 |
| Task 4: | Meetings | $ 2,500 |
| | **TOTAL COST** | **$ 9,450** |

**PROJECT SCHEDULE**

Tasks 1 through 3 can be completed within three (3) weeks of the initiation of the contract between HRP and Anchor Reef Club at Branford, LLC.

**AUTHORIZATION TO PROCEED**

HRP can begin the proposed work immediately, subject to client approval. Before HRP can begin work on this project, we require that you return the **original** copy of the proposal and the **signed original** copy of the attached "Terms and Conditions" authorizing us to proceed with the work described above. Please retain a copy of the original proposal and the signed "Terms and Conditions" for your records.

If you have any questions, please do not hesitate to contact HRP Associates, Inc. at (860) 674-9570.

Sincerely,
HRP ASSOCIATES, INC.

Adam G. Fox, P.E.
Project Manager

AGF
Attachment

**HRP** *Associates, Inc.*

N:\PROPOSALS\A\Anchor Reef_Site Planning.doc

*Creating the Right Solutions Together*

# SOVEREIGN ASSET MANAGEMENT
## 60 Popieluszko Court
## Hartford, CT 06106
## Phone – 860-547-0655
## Fax – 860-547-0506

Date  _8/12/12_

The following pages are for  _Howie_

This transmittal is from  _Jason,_

Number of pages_____, including this cover page

If you're experiencing problems in receiving this fax please call (860) 547-0655 ext. _____

Thank You

# EXHIBIT D

RETURN DATE: JULY 12, 2016          :          **SUPERIOR COURT**

**HRP ASSOCIATES, INC.**          :          **JD OF NEW BRITAIN**

**V.**          :          **AT NEW BRITAIN**

**ANCHOR REEF CLUB AT**
**BRANFORD, LLC**          :          **JUNE 16, 2016**

<u>**COMPLAINT**</u>

<u>**FIRST COUNT**</u>

    1.    On or about November 20, 2006 the Defendant, Anchor Reef Club at Branford, LLC owed the sum of $41,595.38 for professional services renedred at its request and on its behalf by the Plaintiff.  The Defendant had not paid same.

    2.    The Defendant agreed to execute a Promissory Note which set forth its obligations to and its debt to the Plaintiff a copy of which Note is annexed as **Exhibit A.** The Defendant made one payment of $10,000.00 on account.

    3.    The Note is owned and held by the Plaintiff.

    4.    The Defendant has failed to pay the Note in accordance with its terms and is in default under its terms.

    5.    The Plaintiff has demanded payment in full.  The Defendant has failed to pay same or to respond at all.

    6.    The balance due on the Note as of June 14, 2016 is $41,595.38 include interest, as of March 9, 2016 is $108,386.68, plus accruing interest.

    7.    The Note further provides that the Defendant shall pay all costs of collection including without limitation, all costs, expenses, charges, attorney's fees and interest.

**WHEREFORE**, the Plaintiff claims.

1.  Money damages

2.  Pre and post judgment Interest;

3.  Attorney's Fees and Costs;

4.  Such other further relief as in law or equity may apply or may be required; and

5.  Such additional relief as Plaintiff may be entitled to at the time of judgment.


Dated at Milford, Connecticut, this 16th day of June, 2016


PLAINTIFF,

BY: _____
James M. Nugent, Esq.
Harlow, Adams & Friedman, P.C.
One New Haven Avenue, Suite 100
Milford, CT 06460
Telephone No. (203)878-0661
Juris No. 102083

| | | |
|---|---|---|
| RETURN DATE: JULY 12, 2016 | : | SUPERIOR COURT |
| HRP ASSOCIATES, INC. | : | JD OF NEW BRITAIN |
| V. | : | AT NEW BRITAIN |
| ANCHOR REEF CLUB AT BRANFORD, LLC | : | JUNE 16, 2016 |

## STATEMENT OF AMOUNT IN DEMAND

The amount, legal interest or property in demand is greater than $15,000.00, exclusive of interest and costs.

PLAINTIFF,

BY: _____

James M. Nugent, Esq.
Harlow, Adams & Friedman, P.C.
One New Haven Avenue, Suite 100
Milford, CT 06460
Telephone No. (203)878-0661
Juris No. 102083

G:\USERS\TaraA\- nugent\HRP Associates\v. Anchor Reef at Branford, LLC\COMPLAINT.wpd

# EXHIBIT A

# DEMAND PROMISSORY NOTE

**Amount:**    $41,595.38

**Date:**        November 20, 2007

FOR VALUE RECEIVED, the undersigned jointly and severally promise to pay on demand to the order of HRP Associates, Inc. the sum of forty one thousand five hundred ninety-five and 38/100 dollars ($41,595.38) together with interest of 12% per annum on the unpaid balance. The entire principal and any accrued interest shall be fully and immediately payable.

Upon default in making payment within 30 days of demand, and providing this note is turned over for collection, the undersigned agree to pay all reasonable legal fees and costs of collection to the extent permitted by law. This note shall take effect as a sealed instrument and be enforced in accordance with the laws of the State of Connecticut. All parties to this note waive presentment, notice of non-payment, protest and notice of protest, and agree to remain fully bound notwithstanding the release of any party, extension or modification of terms, or discharge of any collateral for this note.

The undersigned and HRP Associates, Inc. agree that this note is being executed with the intent to further secure a debt that remains due and owing to HRP Associates, Inc. for services rendered up to September 28, 2007 in the remaining amount owing of $41,595.38. Nothing in this note shall be construed to in any way limit or constrain the right of HRP Associates, Inc. to exercise any right to collect this debt from the undersigned or any successor entity.

This note cannot be amended except by written agreement of the parties. In the event that any provision or clause of this note conflicts with applicable law, such conflict shall not affect other provisions of this note which can be given effect without the conflicting provision. The provisions of this note are considered severable.

ANCHOR REEF CLUB AT BRANFORD LLC

by _____
[Maker's signature]

Jason Ziegler
Member duly authorized


*NOTICE TO CO-SIGNER: YOUR SIGNATURE ON THIS NOTE MEANS THAT YOU ARE EQUALLY LIABLE FOR REPAYMENT OF THIS LOAN. IF THE BORROWER DOES NOT PAY, THE LENDER HAS A LEGAL RIGHT TO COLLECT FROM YOU.*


_____
[Co-signer's signature]


_____
[Co-signer's typed or printed name]

# EXHIBIT E

DOCKET NO. HHB-CV-16-6033820-S  : SUPERIOR COURT

HRP ASSOCIATES, INC.  : J.D. OF NEW BRITAIN

VS.  : AT NEW BRITAIN

ANCHOR REEF CLUB AT BRANFORD, LLC  : AUGUST 24, 2016

### ANSWER

1. As to Paragraph 1 Defendant admits that money is owed but disputes the sum owed.

2. As to Paragraph 2 Defendant acknowledges that $10,000 was paid on the account and leaves Plaintiff to its proof with respect to allegations regarding the Promissory Note.

3-5. Defendant leaves Plaintiff to its proof regarding allegations in Paragraphs 3 through 5.

6. The Defendant denies the allegations in Paragraph 6.

7. The Defendant leaves Plaintiff to its proof regarding allegations in Paragraph 7.


ANCHOR REEF CLUB AT BRANFORD, LLC
DEFENDANT
BY ITS ATTORNEY


Ronald D. Peikes

KAATZ & PEIKES * ATTORNEYS AT LAW
111 OAK STREET * HARTFORD CONNECTICUT 06106 * (860) 247-5640 * JURIS NO. 30124

W:\Ron\ziegler\motion\HRP Associates\answer.doc

<u>CERTIFICATION</u>

I hereby certify that a copy of the foregoing was e-mailed to Attorney James M. Nugent, Harlow Adams & Friedman PC, One New Haven Avenue, Suite 100, Milford, CT 06460 on or before August 24, 2016.

Ronald D. Peikes
Commissioner of the Superior Court

<div style="text-align: left; writing-mode: vertical">KAATZ & PEIKES * ATTORNEYS AT LAW

111 OAK STREET * HARTFORD CONNECTICUT 06106 * (860) 247-5640 * JURIS NO. 30124</div>

W:\Ron\ziegler\motion\HRP Associates\answer.doc

# EXHIBIT F

| DOCKET NO. HHB-CV-16-6033820-S | : | SUPERIOR COURT |
| --- | --- | --- |
| HRP ASSOCIATES, INC. | : | JD OF NEW BRITAIN |
| V. | : | AT NEW BRITAIN |
| ANCHOR REEF CLUB AT BRANFORD, LLC | : | SEPTEMBER _2_, 2016 |

## MOTION FOR SUMMARY JUDGMENT

The Plaintiff claims that there is no genuine issue as to any material fact in the Complaint and moves for summary judgment and submits herewith the following affidavits and documentary proof.

1. True and correct copy of the Note made the basis of the Plaintiff's Complaint (Exhibit "A");

2. Plaintiff's Affidavit (Exhibit "B");

3. Retainer Agreement (Exhibit "C").


THE PLAINTIFF,


BY:_____
James M. Nugent
James R. Winkel
Harlow, Adams & Friedman, P.C.
One New Haven Avenue, Suite 100
Milford, CT  06460
Tele No. (203) 878-0661
Juris No.:  102083


**NEITHER ORAL ARGUMENT NOR TESTIMONY REQUIRED**

1

## ORDER

The foregoing Motion having been heard and determined, it is hereby

ORDERED:   GRANTED --- DENIED, and the judgment may enter in favor of the

Plaintiff as follows:

a. Principal and Interest - $75,270.53 ($13.87 per diem)

b. Attorney Fees and Costs  - $25,089.93.

DATED:_____                    By the Court,

_____

## CERTIFICATION

This is to certify that a copy of the foregoing was mailed, postage prepaid
and/or sent electronically this date to all counsel and pro se parties of record:

Ronald D. Peikes, Esq.
Kaatz & Peikes
111 Oak Street
Hartford, CT 06106
rpeikes@kaatzandpeikes.com

_____
James M. Nugent
James R. Winkel

2

DOCKET NO. HHB-CV-16-6033820-S  :    SUPERIOR COURT

HRP ASSOCIATES, INC.  :    JD OF NEW BRITAIN

V.  :    AT NEW BRITAIN

ANCHOR REEF CLUB AT
BRANFORD, LLC  :    SEPTEMBER _2_, 2016

## THE PLAINTIFF'S MEMORANDUM OF LAW SUPPORTING
## MOTION FOR SUMMARY JUDGMENT

A.    **Summary Judgment Generally.**

Pursuant to Practice Book Section 17-49, a trial court may "render Summary

Judgment when the documents submitted demonstrate that there is no genuine issue of

material fact remaining between the parties and that the moving party is entitled to

Judgment as a matter of law." Bartha v. Waterbury House Wrecking Company, 190

Conn. 8, 11 (1983).  The party moving for Summary Judgment has the burden of

showing the absence of any genuine issue of material facts. Dougherty v. Graham, 191

Conn. 248, 250 (1971).  To satisfy this burden, the movant must make a showing that is

quite clear what the truth is and there is no real doubt as to the existence of a genuine

issue of material fact. Plouff v. New York, New Haven and H.R. Company, 160 Conn.

482, 488 (1971).  In ruling on a Motion for Summary Judgment, the Court's function is

not to decide issues of material fact, but rather to decide whether any such issues exist.

Nolan v. Barkowski, 206 Conn. 495, 550 (1988).

Once the moving party has presented evidence in support of the Motion for

Summary Judgment, the opposing party must present evidence that demonstrates the

existence of some disputed factual issue.  Burns v. Hartford Hospital, 192 Conn. 451,

455 (1984); Bartha v. Waterbury House Wrecking Company, 190 Conn. 11-12; Farrell

v. Farrell, 182 Conn. 34, 38 (1980).  It is not enough, however, for the opposing party to

merely assert the existence of a disputed issue.  "Mere assertions of fact...are

insufficient to establish the existence of a material fact, and therefore, cannot refute

evidence property present to the court, under Practice Book Section 380." Burns v.

Hartford Hospital, 192 Conn. 455 quoting Bartha v. Waterbury House Wrecking

Company, 190 Conn. 12 "The movant has the burden of showing the nonexistence of

such issues but the evidence thus presented, if otherwise sufficient, is not rebutted by

the bald statement that an issue of fact does exist." Burns v. Hartford Hospital, 192

Conn. 455, quoting Kasowitz v. Mutual Construction Co., 154 Conn. 607, 613 (1967).

**B.**    **No genuine issue of fact exists and judgment should enter as a matter of law.**

The Plaintiff brought suit on a note that was executed by the Defendant, Anchor

Reef Club at Branford, LLC, in November 2007.  ("Note") (Copy of Note attached as

Exhibit "A").  The Note is in the principal amount of $41,595.38, and call for interest to

accrue at the rate of 1% per month, 12% per annum.

In its Answer dated August 24, 2016, the Defendant does not raise any special

defenses, admits that money is owed, but basically disputes the amount claimed owed.

The plaintiff's affidavit (Exhibit "B") establishes the necessary elements of proof in order

for the plaintiff to prevail on its claims as set forth in the complaint, as well as the

amount outstanding on the Note.  Finally, the retainer agreement attached as Exhibit

"C", establishes the attorney fees agreed to be paid by the Plaintiff for the prosecution

2

of this action.  The Plaintiff is entitled to compensation for this amount pursuant to the terms of the Note.

No bona fide reason exists not to grant this motion for summary judgment.

WHEREFORE,  the Plaintiff requests the Court to enter a Summary Judgment in its favor for the amount of $75,270.53, with interest at the contract rate of 12% ($13.87 per diem), until paid, and Attorney Fees and Costs of collection of $25,089.93 (1/3 contingency fee).

THE PLAINTIFF,

BY:_____

James M. Nugent
James R. Winkel
Harlow, Adams & Friedman,
One New Haven Avenue, Suite 100
Milford, CT 06460
Tele No. (203)878-0661
Juris: 102083

3

## CERTIFICATION

This is to certify that a copy of the foregoing was mailed, postage prepaid and/or sent electronically this date to all counsel and pro se parties of record:

Ronald D. Peikes, Esq.
Kaatz & Peikes
111 Oak Street
Hartford, CT 06106
rpeikes@kaatzandpeikes.com

_____
James M. Nugent
James R. Winkel

# DEMAND PROMISSORY NOTE

<u>Amount:</u>   **$41,595.38**

<u>Date:</u>        **November 20, 2007**

FOR VALUE RECEIVED, the undersigned jointly and severally promise to pay on demand to the order of <u>HRP Associates, Inc.</u> the sum of <u>forty one thousand five hundred ninety-five and 38/100 dollars ($41,595.38)</u> together with interest of 12% per annum on the unpaid balance. The entire principal and any accrued interest shall be fully and immediately payable.

Upon default in making payment within 30 days of demand, and providing this note is turned over for collection, the undersigned agree to pay all reasonable legal fees and costs of collection to the extent permitted by law. This note shall take effect as a sealed instrument and be enforced in accordance with the laws of the State of Connecticut. All parties to this note waive presentment, notice of non-payment, protest and notice of protest, and agree to remain fully bound notwithstanding the release of any party, extension or modification of terms, or discharge of any collateral for this note.

The undersigned and HRP Associates, Inc. agree that this note is being executed with the intent to further secure a debt that remains due and owing to HRP Associates, Inc. for services rendered up to September 28, 2007 in the remaining amount owing of $41,595.38. Nothing in this note shall be construed to in any way limit or constrain the right of HRP Associates, Inc. to exercise any right to collect this debt from the undersigned or any successor entity.

This note cannot be amended except by written agreement of the parties. In the event that any provision or clause of this note conflicts with applicable law, such conflict shall not affect other provisions of this note which can be given effect without the conflicting provision. The provisions of this note are considered severable.

ANCHOR REEF CLUB AT BRANFORD LLC

by _____
[Maker's signature]

Jason Ziegler
Member duly authorized


*NOTICE TO CO-SIGNER: YOUR SIGNATURE ON THIS NOTE MEANS THAT YOU ARE EQUALLY LIABLE FOR REPAYMENT OF THIS LOAN. IF THE BORROWER DOES NOT PAY, THE LENDER HAS A LEGAL RIGHT TO COLLECT FROM YOU.*


_____

[Co-signer's signature]


_____

[Co-signer's typed or printed name]


M:\LOGIN\Projects for the top 5\hsh anchor reef Promissary Note.doc     **EXHIBIT A**

DOCKET NO. HHB-CV-16-6033820-S  :    SUPERIOR COURT

HRP ASSOCIATES, INC.                :    JD OF NEW BRITAIN

V.                                  :    AT NEW BRITAIN

ANCHOR REEF CLUB AT
BRANFORD, LLC                       :    SEPTEMBER _2_, 2016

## PLAINTIFF'S AFFIDAVIT IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

STATE OF CONNECTICUT)
                              ss: _Farmington_
COUNTY OF _Hartford_    )

The undersigned, being duly sworn, hereby deposes and says:

1.      I am over the age of eighteen and believe in the obligations of an oath.

2.      I am the Chief Operating Officer for the Plaintiff in the above-captioned

matter and as such I have personal knowledge of the facts contained herein and they

are all correct.  I was also personally and directly involved in the transaction set forth in

the complaint in this case.  I also have personal knowledge of the records and record

keeping practices of the Plaintiff's business, which keeps such records in the regular

course of its business, which records it is the regular course of the Plaintiff's business

to make, and which makes the entries therein at or near the time stated in the records.

4.      On November 20, 2007  Anchor Reef Club at Branford LLC ("Anchor")

owed the Plaintiff $41,595.38 as evidenced by a promissory note for said sum dated on

5

said date, and payable to the order of the Plaintiff with interest from said date accruing at 12% per year. ("Note")  The Note is payable on demand within 30 days thereof.  A true and accurate copy of the Note is attached hereto as Exhibit "A".

5.     The Plaintiff has at all time possessed, and continues to possess, the Note.  It has not endorsed, negotiated, transferred or delivered said Note to any other entity.

6.     Since execution of the Note, the Defendant has only made a one time payment of $10,000.00 toward the amount due and owing.  That payment was made on October 7, 2013, and was credited toward delinquent interest due under the Note.  The Plaintiff has demanded payment of the Note but the Defendant has failed to pay any of the remaining outstanding amount.

7.     The Note is in default by virtue of nonpayment after demand, made at least as of March 9, 2016, and the entire principle balance plus interest at 12% from November 20, 2007 is now due and owing.

8.     The Note also provides for Anchor's payment of the Plaintiff's legal fees and costs of collection upon it's default in payment which the Plaintiff now claims. Attached hereto as Exhibit "C" is a true and correct copy of the retainer agreement which obligates the Plaintiff to pay a 1/3 contingency fee for the prosecution of this action.

9.     Accordingly, the current debt owed the Plaintiff through August 31, 2016 is $75,270.53, with interest at the contract rate of 12% ($10.53 per diem), until paid, and attorney fees and costs of collection of $25,089.93 (1/3 contingency fee).  Attached

6

hereto as Attachment "1", is an accurate accounting of the amount due on the Note and application of the single payment made.

Therefore, I request that judgment enter in favor of the Plaintiff accordingly.

AFFIANT,

Howard Hurd, C.O.O.
HRP Associates, Inc.

Subscribed And Sworn To Before Me this 1st day of September, 2016.

Commissioner of Superior Court /
Notary Public
My Commission Expires:

DEBORAH J. BERARDI
Notary Public-Connecticut
My Commission Expires
May 31, 2021

7



MOVE YOUR ENVIRONMENT FORWARD

**Anchor Reef @ Branford LLC**

| | |
|---|---|
| Original Note: | $ 41,595.38 |
| Date of Note: | 11/20/2007 |
| Interest: | 1% Monthly / 12% Annually |

| Date | Interest |
|---|---|
| 12/20/2007 | $  415.95 |
| 1/20/2008 | $  415.95 |
| 2/20/2008 | $  415.95 |
| 3/20/2008 | $  415.95 |
| 4/20/2008 | $  415.95 |
| 5/20/2008 | $  415.95 |
| 6/20/2008 | $  415.95 |
| 7/20/2008 | $  415.95 |
| 8/20/2008 | $  415.95 |
| 9/20/2008 | $  415.95 |
| 10/20/2008 | $  415.95 |
| 11/20/2008 | $  415.95 |
| 12/20/2008 | $  415.95 |
| 1/20/2009 | $  415.95 |
| 2/20/2009 | $  415.95 |
| 3/20/2009 | $  415.95 |
| 4/20/2009 | $  415.95 |
| 5/20/2009 | $  415.95 |
| 6/20/2009 | $  415.95 |
| 7/20/2009 | $  415.95 |
| 8/20/2009 | $  415.95 |
| 9/20/2009 | $  415.95 |
| 10/20/2009 | $  415.95 |
| 11/20/2009 | $  415.95 |
| 12/20/2009 | $  415.95 |
| 1/20/2010 | $  415.95 |
| 2/20/2010 | $  415.95 |
| 3/20/2010 | $  415.95 |
| 4/20/2010 | $  415.95 |
| 5/20/2010 | $  415.95 |
| 6/20/2010 | $  415.95 |
| 7/20/2010 | $  415.95 |
| 8/20/2010 | $  415.95 |
| 9/20/2010 | $  415.95 |

# ATTACHMENT 1

Anchor Reef
August 31, 2016
Page 2

| Date | | Amount |
|---|---|---|
| 10/20/2010 | $ | 415.95 |
| 11/20/2010 | $ | 415.95 |
| 12/20/2010 | $ | 415.95 |
| 1/20/2011 | $ | 415.95 |
| 2/20/2011 | $ | 415.95 |
| 3/20/2011 | $ | 415.95 |
| 4/20/2011 | $ | 415.95 |
| 5/20/2011 | $ | 415.95 |
| 6/20/2011 | $ | 415.95 |
| 7/20/2011 | $ | 415.95 |
| 8/20/2011 | $ | 415.95 |
| 9/20/2011 | $ | 415.95 |
| 10/20/2011 | $ | 415.95 |
| 11/20/2011 | $ | 415.95 |
| 12/20/2011 | $ | 415.95 |
| 1/20/2012 | $ | 415.95 |
| 2/20/2012 | $ | 415.95 |
| 3/20/2012 | $ | 415.95 |
| 4/20/2012 | $ | 415.95 |
| 5/20/2012 | $ | 415.95 |
| 6/20/2012 | $ | 415.95 |
| 7/20/2012 | $ | 415.95 |
| 8/20/2012 | $ | 415.95 |
| 9/20/2012 | $ | 415.95 |
| 10/20/2012 | $ | 415.95 |
| 11/20/2012 | $ | 415.95 |
| 12/20/2012 | $ | 415.95 |
| 1/20/2013 | $ | 415.95 |
| 2/20/2013 | $ | 415.95 |
| 3/20/2013 | $ | 415.95 |
| 4/20/2013 | $ | 415.95 |
| 5/20/2013 | $ | 415.95 |
| 6/20/2013 | $ | 415.95 |
| 7/20/2013 | $ | 415.95 |
| 8/20/2013 | $ | 415.95 |
| 9/20/2013 | $ | 415.95 |
| 10/20/2013 | $ | 415.95 |

$10,000 payment made on 10/22/2013
applied to Interest

| Date | | Amount |
|---|---|---|
| 11/20/2013 | $ | 415.95 |
| 12/20/2013 | $ | 415.95 |
| 1/20/2014 | $ | 415.95 |



Anchor Reef
August 31, 2016
Page 3

| | | |
|---|---|---|
| 2/20/2014 | $ | 415.95 |
| 3/20/2014 | $ | 415.95 |
| 4/20/2014 | $ | 415.95 |
| 5/20/2014 | $ | 415.95 |
| 6/20/2014 | $ | 415.95 |
| 7/20/2014 | $ | 415.95 |
| 8/20/2014 | $ | 415.95 |
| 9/20/2014 | $ | 415.95 |
| 10/20/2014 | $ | 415.95 |
| 11/20/2014 | $ | 415.95 |
| 12/20/2014 | $ | 415.95 |
| 1/20/2015 | $ | 415.95 |
| 2/20/2015 | $ | 415.95 |
| 3/20/2015 | $ | 415.95 |
| 4/20/2015 | $ | 415.95 |
| 5/20/2015 | $ | 415.95 |
| 6/20/2015 | $ | 415.95 |
| 7/20/2015 | $ | 415.95 |
| 8/20/2015 | $ | 415.95 |
| 9/20/2015 | $ | 415.95 |
| 10/20/2015 | $ | 415.95 |
| 11/20/2015 | $ | 415.95 |
| 12/20/2015 | $ | 415.95 |
| 1/20/2016 | $ | 415.95 |
| 2/20/2016 | $ | 415.95 |
| 3/20/2016 | $ | 415.95 |
| 4/20/2016 | $ | 415.95 |
| 5/20/2016 | $ | 415.95 |
| 6/20/2016 | $ | 415.95 |
| 7/20/2016 | $ | 415.95 |
| 8/20/2016 | $ | 415.95 |

**Total Interest\***    **$ 33,675.15**

**Note Balance**    **$ 41,595.38**

**Total Due**    **$ 75,270.53**

\*Interest balance was reduced from $10,000 payment made on 10/22/13



# HARLOW, ADAMS & FRIEDMAN, P.C.
## Attorneys at Law

DANA ERIC FRIEDMAN
THEODORE H. SHUMAKER
JAMES M. NUGENT
JOSEPH A. KUBIC
WILLIAM T. BLAKE, JR.
JAMES R. WINKEL
DANIELLE M. BERCURY
ANDREW W. SKOLNICK
MICHAEL T. DOLAN

WILLIAM D. HARLOW (1921-1988)
GEORGE W. ADAMS, III (retired)

ONE NEW HAVEN AVENUE
MILFORD, CT 06460

TELEPHONE: 203.878.0661
FACSIMILE: 203.878.9568

MICHAEL P. A. WILLIAMS, of Counsel

website: harlowadamsfriedman.com

April 27, 2016

HRP Associates, Inc.
Attn: Howard S. Hurd, Chief Operating Officer
197 Scott Swamp Road
Farmington, CT 06032

Re:    HRP Associates, Inc. v. Anchor Reef Club at Branford, LLC

Dear Howard:

Thank you for asking our firm to represent you in this matter.

The purpose of this letter is to memorialize our fee arrangement with you (the "Client") with respect to the legal representation by Harlow, Adams & Friedman, P.C. for the above referenced matters ("Matter"). The legal representation and advice provided by Harlow, Adams & Friedman, P.C. as set forth in this agreement will be for the above Matter only.

Harlow, Adams & Friedman, P.C. is being retained to represent you for:

Commencement of a lawsuit against Anchor Reef at Branford, LLC for all sums owed on a certain Note.

The legal fees to be paid to Harlow, Adams & Friedman, P.C. will be as follows:

1/3 of any gross proceeds recovered by judgment, settlement or any other form of recovery; plus a non-contingent suit fee of $600.00 to be applied to any recovery; and, $500.00 for costs.

Page 1 of 3



EXHIBIT C

$1,100.00
Pd on 5/18/16

In addition, you will be charged for expenses such as for outside service of copying materials, telefax, federal express charges, courier and messenger services, charges for serving and filing papers, recording and certifying documents, depositions, transcripts, computerized research and such other expenses incidental to and customary to the rendering of the legal services by Harlow, Adams & Friedman, P.C. for the Matter. Major fees such as expert witnesses will be sent to you for direct payment if needed and after your approval.

Any outstanding balances not paid when due as agreed above will accrue at an interest charge of six percent (6%) per annum (one- half percent (.5%) per month) 60 days from the due date until paid.  If you have more than one case or matter with our office, we are authorized to apply unused funds from one case or matter to another of your cases or matters with notice to you of how the funds were applied.

Any expressions on our part concerning the outcome of your legal matters are expressions of our best professional judgment, but are not guarantees. Such opinions are necessarily limited by our knowledge of the facts and are based on the state of the law at the time they are expressed.

For us to provide these services effectively, you agree to disclose fully and accurately all pertinent facts and keep us apprised of all developments in the matter. You further agree otherwise to cooperate fully with us and to be available to attend such meetings, conferences, hearings, and other proceedings as is appropriate. You know that the outcome of this mater is uncertain, and you understand that we have made and can make no promises or guarantees, by this letter or otherwise, about the outcome.

The client has the right to terminate our representation by written notice at any time. In that case, you are not relieved of the obligation to pay for all services rendered and costs incurred on your behalf prior to receipt of such notice. We have the same right to terminate our engagement, subject to an obligation to comply with applicable law to give the client reasonable notice to arrange alternative representation and the court's permission to withdraw from a pending case.  A lawyer may withdraw from representing a client if:

(1) withdrawal can be accomplished without material adverse effect on the interests of the client; (2) the client persists in a course of action involving the lawyer's services that the lawyer reasonably believes is criminal or fraudulent; (3) the client has used the lawyer's services to perpetrate a crime or fraud; (4) the client insists upon taking action that the lawyer considers repugnant or with which the lawyer has a fundamental disagreement; (5) the client fails substantially to fulfill an obligation to

the lawyer regarding the lawyer's services and has been given reasonable warning that the lawyer will withdraw unless the obligation is fulfilled; (6) the representation will result in an unreasonable financial burden on the lawyer or has been rendered unreasonably difficult by the client; or (7) other good cause for withdrawal exists.

Our office has a file retention and destruction policy. We will retain either paper or electronic copies of files for a maximum of 10 years after the matter, case or transaction is concluded. You can obtain copies of documents from the file at 15 cents per page. Original deeds, mortgages and other important documents are generally sent to the client during the course of representation. After the passage of 10 years the file will be destroyed without any further notice to you.

Please review this agreement carefully, and if you have any questions concerning the foregoing terms and conditions, do not hesitate to contact me. If this agreement is acceptable to you, please sign and return a copy, whereupon we shall commence our representation. We recommend that you keep a copy of this letter in your file.

Thank you very much for giving us the opportunity to represent you. We look forward to working with you in connection with this matter and we appreciate your entrusting it to us.

Very truly yours,
HARLOW, ADAMS & FRIEDMAN, P.C.

James M. Nugent

I have read and understand the terms of this agreement and agree to them.

Dated this _27_ day of _April_, 2016.

HRP Associates, Inc.

By: _____
Name: _Howard Hurd_
Title: _COO_

Page 3 of 3

# EXHIBIT G

**HARLOW, ADAMS & FRIEDMAN, P.C.**
TRUSTEE ACCOUNT
ONE NEW HAVEN AVENUE • SUITE 100
MILFORD, CT 06460

CLIENT NUMBER

**Citizens Bank**

51-7011/2111

43259

| DATE | NUMBER | AMOUNT |
|------|--------|--------|
| 11/08/2016 | 43259 | *$50,862.72 |

PAY     *** FIFTY THOUSAND EIGHT HUNDRED SIXTY-TWO & 72/100 DOLLARS

TO THE
ORDER OF     HRP Associates, Inc.

THIS DOCUMENT CONTAINS HEAT SENSITIVE INK. TOUCH OR PRESS HERE - RED IMAGE DISAPPEARS WITH HEAT.

---

HARLOW, ADAMS & FRIEDMAN, P.C. • MILFORD, CT 06460          PAY TO     HRP Associates, Inc.          43259

| DATE | TRUST NAME | DESCRIPTION | AMOUNT |
|------|-----------|-------------|--------|
| 11/08/2016 | HRP Associates, Inc.<br>Account: | net proceeds to client | 50,862.72 |

---

| CHECK DATE | CHECK NO. | CHECK AMOUNT |
|-----------|-----------|--------------|
| 11/08/2016 | 43259 | 50,862.72 |

# EXHIBIT H



MOVE YOUR ENVIRONMENT FORWARD

## RELEASE

TO ALL WHOM THESE PRESENTS SHALL COME OR MAY CONCERN,

GREETINGS, Know ye, that **HRP ASSOCIATES, INC.** (the "Releasor") for and in consideration of the sum of Seventy Five Thousand Two Hundred Seventy and 53/100 ($75,270.53) Dollars, lawful money of the United States in hand paid by **ANCHOR REEF CLUB AT BRANFORD, LLC and JASON ZIEGLER** (the "Releasees"), the receipt whereof is hereby acknowledged, have remised, released and forever discharged, and by these presents does for themselves, their heirs, executors, successors and assigns, remise, release and forever discharge the said Releasees, their officers, employees, agents, successors, heirs and assigns, of and from the specific  claims made in an action brought in the Superior Court, Judicial District of New Britain at New Britain, Docket No. HHB-CV-16-6033820-S, known as <u>HRP Associates, Inc. v. Anchor Reef Club at Branford, LLC</u>.

Signed this 36th day of October, 2016.

Witnessed:

*Joan D Daigle*

HRP ASSOCIATES, INC.

Howard Hurd
Its Chief Operating Officer

STATE OF CONNECTICUT )

) ss: Farmington          October 31 , 2016

COUNTY OF Hartford )

Personally  appeared,  Howard S. Hurd , COO          of HRP Associates, Inc., signer and sealer of the foregoing instrument who acknowledged the same to be his free act as such  COO      and the free act and deed of HRP Associates, Inc., before me.

Notary Public
~~Commissioner of the Superior Court~~

DEBORAH J. BERARDI
Notary Public-Connecticut
My Commission Expires
May 31. 2021